# Illinois Official Reports

## Appellate Court

---

**_People v. Starks_, 2014 IL App (1st) 121169**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRANDON STARKS, Defendant-Appellant. |
| District & No. | First District, Third Division <br> Docket No. 1-12-1169 |
| Filed | June 4, 2014 |
| Held <br> (*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for first degree murder was reversed and the cause was remanded for a new trial on the ground that the admission of three weapons, including the murder weapon, discovered two months after the murder in an apartment in a building defendant was seen running from was reversible error under the first prong of the plain-error doctrine, since the evidence was closely balanced, no evidence connected defendant to the weapons or the apartment in which they were found, save the circumstantial evidence that he had access through an open window, the DNA evidence concerning the murder weapon only showed that defendant could not be excluded from being a contributor to the DNA, and the eyewitness testimony was inconsistent. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-3064; the Hon. James B. Linn, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Pamela Rubeo, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, Janet C. Mahoney, and Tasha-Marie Kelly, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE MASON delivered the judgment of the court, with opinion. Presiding Justice Hyman specially concurred, with opinion, joined by Justice Pucinski.

## OPINION

¶ 1  Following a jury trial, defendant Brandon Starks was convicted of first degree murder and sentenced to 50 years in prison. On appeal, Starks contends that (1) the State failed to prove him guilty beyond a reasonable doubt where he had no connection to the victim, the police suspected him on the basis of an uncorroborated anonymous tip, and the eyewitness identifications two months after the shooting were unreliable; (2) the State violated the trial court's ruling on other crimes evidence by introducing testimony and photographs of other weapons that had no connection to the shooting or to Starks; (3) the trial court abused its discretion when it barred expert testimony on eyewitness identifications without considering the relevance and weight of the proffered testimony; (4) the trial court erred when it failed to exclude the lineup identifications where the lineups violated Starks' right to counsel and due process; and (5) the trial court erred when it failed to ask prospective jurors whether they accepted and understood all of the principles enumerated in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). Because we conclude that certain of the issues identified by Starks have merit and because the resulting errors deprived Starks of a fair trial, we reverse the judgment of the circuit court of Cook County and remand for a new trial.

¶ 2                                    BACKGROUND

¶ 3  At approximately 10 a.m. on November 3, 2009, Robert Shine was shot and killed near 79th and St. Lawrence Streets in Chicago. There were three eyewitnesses to the shooting, and they each gave statements to the police, but none of them were able to give police the name of the shooter.

¶ 4  After learning of her son's death, Shine's mother, Andrea Reed, contacted people who were acquainted with her son in an attempt to find out what had happened. A few days later, Reed received an anonymous voice mail message. The caller stated that someone known as "Turd" shot her son. Reed contacted the police and informed them of the phone call.

¶ 5        The police were able to associate the nickname "Turd" with Starks. They obtained a photograph of Starks and assembled a photo array. Shortly after the occurrence, two of the three eyewitnesses identified Starks in the array as the person who shot Shine. An investigative alert was then issued for Starks. Starks was apprehended two months later on January 6, 2010, and a weapon of the same caliber as the gun used in the shooting was also recovered on that date. Two of the eyewitnesses later identified Starks in separate physical lineups. The third eyewitness did not identify anyone in the lineup, but informed the assistant State's Attorney after the lineup that he realized that Starks was the shooter. Starks was charged with first degree murder.

¶ 6        Prior to trial, Starks filed a motion to suppress the identifications. At the hearing on the motion, Detective Robert N. Barnes testified that the description the police received at the scene of the shooting was that the shooter was a black male with a dark complexion and dreadlocks or twisted hair. Detective Barnes testified that the police did not rely on the physical description to assemble the photo array. Instead, the police learned that the shooter was someone who went by the nickname "Turd" and were able to determine that Starks used that nickname.

¶ 7        After Starks was apprehended, three separate physical lineups were conducted with one eyewitness viewing the lineup on January 6, 2010, and the other two eyewitnesses viewing the lineup at separate times on January 7. An attorney who represented Starks came to the police station between the two lineups on January 7 and was allowed to speak with Starks. After Starks' attorney left, the third lineup was conducted. Nobody at the police station attempted to contact Starks' attorney to return to the police station for the third lineup.

¶ 8        In denying the motion to suppress, the trial court found that the young men in the photo array looked similar to one another and there was nothing inherently wrong with the photo array. The trial court further found that because the third lineup occurred prior to the indictment, Starks' rights were not violated when his attorney was not notified of the lineup.

¶ 9        On the date the trial was originally scheduled to begin, counsel for Starks told the trial court that he anticipated filing a motion *in limine* to allow expert testimony concerning eyewitness identification. However, before counsel said the word "identification," the trial court said:

> "Denied. Denied. You file whatever motion you want. We are not going to do that. That's going to be denied. I am telling you right now. Don't expect it. Go ahead and file it. *** It is not going to happen."

Defense counsel pointed out that the supreme court said the admission of expert testimony regarding eyewitness identification was discretionary and the trial court responded, "Denied. It's nonsense."

¶ 10        On the date the trial began, Starks filed a motion *in limine* to bar evidence that he had another murder charge and a separate drug charge pending. The State confirmed that it did not plan to refer to either of the pending cases, or to the fact that narcotics were also recovered in the apartment where the murder weapon was found. Starks then filed his motion to allow expert testimony concerning eyewitness evidence. Starks' motion did not identify an expert or indicate what topics the expert testimony would address other than to indicate generally that the expert would address the effect that stress and the presence of a weapon have on the accuracy of memory. The trial court explained that the motion was denied because the court felt that the subjects that such an expert would discuss, including human emotion, are things

that a layperson could understand and that all jurors already know. The court said that it would allow Starks latitude to cross-examine eyewitnesses about being distracted, excited or nervous, but that the court viewed expert eyewitness testimony as more of a hindrance than a help.

¶ 11     Jury selection proceeded. In instructing the venire, the trial court explained that (1) the defendant is presumed to be innocent, (2) an indictment is not an indication of guilt, (3) the defendant has to be proven guilty beyond a reasonable doubt, and (4) the defendant does not have to testify or call any witnesses and the failure to do so cannot be held against him. After explaining each proposition, the trial court asked the venire as a group if anyone had a disagreement or problem with that proposition. No member of the venire responded.

¶ 12     At trial, Reed testified that the police had not given her the names of anyone who may have been suspected in the shooting death of her son. She further testified that she did not know the individual who left the message that Turd had shot her son, and that she had never met Starks and did not know of any connection between Starks and her son.

¶ 13     Keona Cherry, Shine's girlfriend, testified that Shine was driving her vehicle on the morning of the shooting. He dropped her off at her grandmother's house on 80th and St. Lawrence Streets so that she could change her clothes for a job interview and said he would be back to pick her up in a few minutes. When Shine did not return or answer his cell phone, Cherry looked out the window and saw police cars driving past. She went outside and walked toward 79th Street. When she got closer to 79th Street, she saw her vehicle across the street from a store on 79th Street, still running, and then she saw Shine on the ground near the store. Cherry confirmed that she did not know Starks and had never heard of him prior to the shooting.

¶ 14     Ronald Draper testified that he pulled his car into the parking lot of Pride Cleaners at 79th Street and St. Lawrence Street on the morning of the shooting. Draper had just exited his car and was turning toward the trunk when he heard a pop from somewhere behind him. At first, Draper thought the sound was a firecracker, but after taking another step, he heard two more pops and realized it was gunfire. Draper ducked down beside his vehicle and heard four or five more shots in rapid succession.

¶ 15     After a few seconds, Draper stood up and looked around. He saw a man stepping from the street onto the sidewalk in front of the cleaners. Draper identified Starks in court as the man he saw. Draper saw that Starks had a gun in his left hand and watched him put the gun in his front pants pocket. Starks then walked north on St. Lawrence Street.

¶ 16     Draper called the police and waited at the scene, where he gave a description of Starks to the police when they arrived. On November 12, 2009, a detective brought a photo array to Draper's house. Draper testified that he recognized the photograph of Starks as the person he had seen with the gun, but told the detective that although he was sure he could identify the shooter, he would prefer to see a physical lineup before he made an identification. On January 6, 2010, Draper went to the police station and identified Starks as the shooter in a physical lineup.

¶ 17     Geraldine Howard testified that she was also in the parking lot of Pride Cleaners the morning of the shooting. Howard was putting some clothes in the backseat of her car when she heard two gunshots. She stood up and saw a man running and another man chasing him with a gun in his hand. The man who was running fell to the ground in the parking lot of a convenience store across the street and the other man stood over him and shot him two or three more times. The shooter then ran away and Howard walked over to the man who was on the

ground because she wanted to pray for him. Howard got a good look at the shooter and described him as a man with dreadlocks, a description she gave the police when they arrived.

¶ 18    On November 19, 2009, approximately two weeks after Shine's murder, police officers came to Howard's home and showed her a photo array. Howard identified Starks in the photo array, and also at a physical lineup in January. When Howard viewed the physical lineup, all of the subjects in the lineup were wearing skullcaps so she could not tell whether anyone had dreadlocks, but she identified Starks because she remembered his face.

¶ 19    Bailey Wright testified that he went to the currency exchange on 79th and Rhodes Streets at approximately 10 a.m. on November 3 and was walking from the currency exchange toward the cleaners when he heard several gunshots. Wright saw a young man running toward a convenience store and another young man with a gun in his hand running behind him and firing a gun. Wright identified Starks in court as the shooter. Wright knew Shine, the victim, from the neighborhood. He saw Shine fall near the entrance to the convenience store, and then Starks stood over him and shot him five more times. Starks then ran from the scene and Wright ran toward Shine, who was coughing up blood, and told him to hold on, but Shine's eyes rolled back in his head and Wright knew he was dead. Wright called 911 and spoke to the police when they arrived.

¶ 20    On November 12, Wright met with detectives, viewed a photo array, and identified a photograph of Starks as the person who shot Shine. On January 7, Wright went to the police station to view a physical lineup. Wright viewed the lineup but was not able to identify anyone. However, Wright testified that he went back to a room and sat down, and then it dawned on him that the first person in the lineup was the shooter. Wright told an assistant State's Attorney that the shooter was the first person in the lineup. Wright confirmed in court that the first person in the lineup was Starks.

¶ 21    On cross-examination, Wright stated that there were other people in the parking lot in front of the cleaners, but that he was the only one who went over to Shine immediately after he was shot. As Wright was standing next to Shine, another individual on a bike came up, but nobody walked over from the parking lot in front of the cleaners. Wright also confirmed that after he identified Starks in the photo array, he told police he had seen Starks around the neighborhood previously. Although Wright testified that he told the assistant State's Attorney he recognized Starks in the lineup after the attorney asked him about it, on redirect Wright said that nobody asked him about the lineup before he told the assistant State's Attorney that he realized the shooter was the first person in the lineup.

¶ 22    Detective William Filipiak was assigned to investigate Shine's murder. After Reed called and told the police about the anonymous tip she received and after two of the three eyewitnesses subsequently identified Starks in the photo array, the police issued an investigative alert for Starks. Detective Filipiak explained that an investigative alert is an electronic notification that is entered into the police computer system so that if the police stop someone on the street and look that person's name up, they will be able to determine that police are looking for that individual.

¶ 23    Detective Filipiak learned that Starks had been apprehended on January 6 and that three weapons were also recovered on that date. One of the weapons was a .45 Glock, and the cartridge cases recovered at the scene of Shine's murder were also .45 caliber. The weapon was sent for fingerprinting and ballistics and DNA testing. A physical lineup was conducted, and Draper and Howard identified Starks in the lineup. Wright did not initially identify anyone in

the lineup, but during an interview with the assistant State's Attorney and a detective, he told them that Starks was the person he saw shoot Shine.

¶ 24    Detective Filipiak confirmed that although Wright told him at the photo array that he recognized Starks from the neighborhood, he did not tell police at the scene that he recognized the shooter. He also confirmed that Howard never told him that she walked over and stood beside Shine after the shooting, and Howard was not standing in the vicinity of Shine's body when the police arrived at the scene.

¶ 25    Detective Lorne Gushinere testified that she was assigned to the fugitive apprehension team on January 6, 2010. She was working with other officers in the vicinity of 80th Street and Ellis Avenue looking for an individual in an unrelated case. The officers were conducting surveillance of an apartment building when they observed the individual who was wanted in the other case. Two officers exited their vehicle and chased this individual, who began running when he saw the officers.

¶ 26    Detective Gushinere drove around to the alley behind the apartment building and saw two males exit the rear of the apartment building and run through the alley. One of the young men was wearing a T-shirt and no shoes, and when Detective Gushinere stopped them, he told her his name was Brandon Starks. Detective Gushinere recognized Starks' name because he was the subject of an investigative alert and she had been assigned to locate him.

¶ 27    Detective Brian McKendry was part of the fugitive apprehension team on January 6. He pursued an individual inside the apartment building with other officers and detained that individual on the stairs. Detective McKendry and the officers who were with him then heard footsteps and doors opening and closing on the third floor. Detective McKendry went with some other officers to the third floor where they noticed that the door to apartment 3 North was ajar. The officers entered the apartment and realized no one was there. Detective McKendry approached the kitchen and observed three handguns on the kitchen counter. Evidence technicians were called to recover and process the weapons.

¶ 28    On cross-examination, Detective McKendry acknowledged that he did not see Starks in the apartment or running out of it, and that the back door to the apartment was gated and padlocked. On redirect, Detective McKendry pointed out that a window on the third-floor landing was pushed all the way up and there was access from the window onto the rear porch of the building.

¶ 29    No latent fingerprints suitable for comparison were found on the .45-caliber handgun, the magazine, or the live cartridges recovered from the apartment. Ballistics testing on the handgun, the fired cartridge cases from the scene, and the bullets removed from Shine determined that the .45 Glock recovered from the apartment was the weapon used in the shooting.

¶ 30    Katrina Gomez testified as an expert in the field of forensic DNA analysis. Gomez compared the DNA on swabs taken from the .45-caliber handgun with a buccal swab from Starks. The DNA on the gun was identified as a mixture of the DNA profiles of at least three people. Gomez was able to identify a major male contributor, meaning that one person contributed his DNA at a higher level than other persons who also handled the weapon. When Gomez compared that DNA profile to Starks' DNA profile, she determined that Starks could not be excluded as the contributor. Gomez also calculated how rare the profile from the handgun would be in the general population, and testified that approximately 1 in 15

quadrillion unrelated black individuals could not be excluded from having contributed to the profile.

¶ 31　　On cross-examination, Gomez acknowledged that she prepared three reports with the results of the DNA testing, and that one of those reports stated that one in three unrelated black individuals could not be excluded. Gomez removed that statement from her report at the request of her supervisor. Gomez also confirmed that concluding that someone cannot be excluded is not the same thing as an identity match. On redirect, Gomez explained that the 1-in-3 calculation applied to the mixture of at least three individuals, while the 1 in 15 quadrillion calculation applied to the profile of the major contributor.

¶ 32　　Karl Reich testified on behalf of Starks as an expert in the field of DNA analysis. Reich explained that when you have a mixture of three or more people, it becomes more difficult to make use of the results and one person cannot be uniquely identified in such a mixture. If you are using a mixture with three contributors, many people can be identified because, on average, any two random people will share between four and eight results. Reich further explained that just because one person can be found in the mixture, it does not mean that he is the only option for that mixture but rather that he is one of many who could be identified using that mixture.

¶ 33　　An allele is a choice at a particular genetic locus, such as eye color or whether the earlobes are attached or free. In a DNA profile, there are options at all of the loci that are measured. The process of establishing a DNA profile involves determining the specific alleles at each defined region. The current FBI view is that one person can be uniquely identified by determining the alleles at each of 13 defined regions. Reich agreed that Starks' profile could be found in the mixture that was tested from the handgun, but explained that because there were multiple results at each one of the defined loci, other people would also fit that profile.

¶ 34　　Reich explained that if an analyst selects the alleles desired at each loci, the analyst can uniquely identify one person, but it is just one choice out of many possible choices. Thus, Reich observed that the statistic given in the earlier report that 1 in 3 unrelated black individuals could not be excluded from the mixture was not inconsistent with the later report that stated that 1 in 15 quadrillion could not be excluded from the profile that the police lab identified as the major contributor profile. However, with DNA profiles for three black males, an analyst could identify any one of the three of them from the mixture in the same manner, by selecting the alleles desired at each loci.

¶ 35　　There is also no way to tell from the DNA when or in what order the contributors left their DNA on the weapon or what any individual contributor did with the weapon, namely, whether a contributor fired the weapon, cleaned it, or merely picked it up. The fact that the weapon was not recovered until two months after the shooting was also significant because DNA evidence cannot tell the intervening history of what occurred with the weapon over that time period.

¶ 36　　In Reich's opinion, the initial report from the police lab that provided statistics on the mixture itself as well as on the selected profile was the more neutral report. There was no explanation in the later report as to why the statistics related to the mixture were excluded.

¶ 37　　On cross-examination, Reich explained that it is possible to isolate a major contributor where a sample only contains DNA from two contributors and one person contributed more DNA, and where there is an unambiguous major and minor contributor at every locus. If it is not possible to identify the major contributor at every locus, then a complete profile is lacking and only a partial profile or a subset is available. Reich acknowledged that the State's analyst did not violate any recognized standard and followed the correct procedures in her analysis.

¶ 38 The defense rested and the jury began deliberations. Approximately one hour into deliberations, the jurors sent out a note asking what would happen if they could not reach a verdict. After consulting with both parties, the trial court simply advised the jury to continue deliberating. After another hour-and-a-half of deliberations, the jurors asked for the transcripts of the eyewitnesses' testimony. The transcripts were sent back to the jury room. Approximately 30 minutes later, the jury reached a verdict, finding Starks guilty of first degree murder.

¶ 39 Starks filed a timely posttrial motion. At the hearing on the motion, defense counsel argued that, at the very least, an evidentiary hearing should have been held on the issue of expert testimony related to eyewitness identification, especially in light of the fact that the jury asked for the transcripts of the eyewitnesses' testimony. The trial judge explained that he had read Starks' motion and some of the supporting documentation that had been filed, and had listened carefully and weighed how it would play out in front of the jury, but found the testimony to be completely unhelpful because eyewitness identification is something a lay witness can comprehend.

¶ 40 Starks also argued that his constitutional right to counsel was violated when the police conducted the third lineup without notifying his attorney. The trial court noted that once Starks invoked his right to counsel, the police did not interrogate him further. However, the court ruled that because Starks had not yet been indicted at the time of the lineup, he did not have the right to have counsel present. The posttrial motion was denied.

¶ 41 At the sentencing hearing, Starks' mother, father and sister all testified that they were in shock and that the crime for which Starks was convicted was completely out of character for him. The assistant principal at the high school Starks attended, who also was his guidance counselor all four years, testified that Starks was a good student, volunteered regularly for community service activities, and mentored younger students. Both the assistant principal and the dean of students at the high school testified that they were shocked by the charges against Starks.

¶ 42 The trial court observed that although Starks had no prior criminal convictions or juvenile adjudications, came from a good family, did well in school, and had people still willing to vouch for him from his high school years, the police found him "in possession of something of a fearful looking arsenal of guns," including the murder weapon. The court further noted that when Starks first came into the courtroom, he was accused of two separate murders. The trial judge stated, "So there's a terrible disconnect here. I don't understand how this happened." Starks was sentenced to 25 years on the first degree murder charge and a consecutive sentence of 25 years for personally discharging a firearm and causing Shine's death, for a total of 50 years. Starks timely filed this appeal.

¶ 43                                                    ANALYSIS
¶ 44                                        A. Sufficiency of the Evidence
¶ 45 Starks first contends that the State failed to prove beyond a reasonable doubt that he shot Shine where no connection was shown between Shine and Starks, the police tip was based on an uncorroborated, anonymous voice mail message, and the eyewitnesses' lineup identifications made two months after the shooting were unreliable. When reviewing a challenge to the sufficiency of the evidence, a reviewing court must determine "whether,

[after] viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *People v. Austin M.*, 2012 IL 111194, ¶ 107. Under this standard, a reviewing court does not retry the defendant or substitute its judgment for that of the trier of fact with regard to the credibility of the witnesses, the weight to be given to each witness's testimony, and the reasonable inferences to be drawn from the evidence. *Id*. A criminal conviction will not be overturned on insufficient evidence grounds unless the proof is so improbable or unsatisfactory that a reasonable doubt as to the defendant's guilt exists. *People v. Pollock*, 202 Ill. 2d 189, 217 (2002).

¶ 46    We have examined the evidence in light of the foregoing principles and conclude that a rational trier of fact could have found beyond a reasonable doubt that Starks shot Shine. While we do not agree that the State presented "a remarkably strong case," there were three eyewitness identifications and it is the province of the jury to determine the credibility of those witnesses. We cannot say that the identifications were so improbable or unsatisfactory that a reasonable doubt as to Stark's guilt exists.

¶ 47    We agree with Starks that no direct physical evidence links him to the crime. Even when viewing the DNA evidence in the light most favorable to the prosecution, that evidence establishes only that Starks cannot be excluded from having contributed his DNA, along with at least two other people, to a gun that was never shown to be in his possession and was not recovered until two months after Shine was killed. Therefore, the DNA evidence establishes only a possible circumstantial connection between Starks and the murder weapon. There was also no evidence presented of any connection between Starks and Shine or any motive for the killing. While it is not necessary for the State to prove a motive for a crime (see *People v. Parks*, 133 Ill. App. 2d 348, 351 (1971)), the lack of any identifiable motive can certainly give rise to a reasonable doubt.

¶ 48    Thus, the primary evidence upon which Starks' conviction is based is the eyewitness identification of three individuals. It is well established that a single witness's identification is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification. *People v. Lewis*, 165 Ill. 2d 305, 356 (1995). In assessing identification testimony, Illinois courts rely on the factors set out by the Supreme Court in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). *Lewis*, 165 Ill. 2d at 356. Those factors are: (1) the opportunity the witness had to view the offender at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the offender; (4) the level of certainty demonstrated by the witness at the identification confrontation; and (5) the length of time between the crime and the identification confrontation. *Id*.

¶ 49    Detective Barnes testified at the motion to suppress that the description the police received at the scene of the shooting was that the shooter was a black male with a dark complexion and dreadlocks or twisted hair. The only evidence presented at trial regarding the description given to police came from the testimony of Howard, who testified that the shooter had dreadlocks. Draper simply testified that he had given police a description, but he did not provide any details of that description. Moreover, Howard was the only eyewitness who identified Starks in both the photo array and at the lineup.

¶ 50    In considering the *Biggers* factors in relation to Howard's identification, we conclude that all of the factors weigh in the State's favor. Howard testified that she stood up from placing something in the backseat of her car when she heard the gunshots, got a good look at the

shooter's face as he ran past her, watched while he stood over Shine and fired a few more times, and saw him run away. She testified that the shooter had dreadlocks, she identified him in the photo array and there was nothing to suggest this identification was uncertain; she identified him again at the lineup where he was wearing a cap to cover his hair, testifying that she was able to do so because she remembered his face. Moreover, her initial identification was made on November 19, just over two weeks after the shooting. Compare *Biggers*, 409 U.S. at 201 (noting that a lapse of seven months would be a negative factor in most cases), and *People v. Piatkowski*, 225 Ill. 2d 551, 570 (2007) (stating that a delay of six months did not favor the State), with *People v. Simpson*, 172 Ill. 2d 117, 141 (1996) (concluding that an identification less than six days after the crime occurred weighed in favor of the State). Thus, Howard's identification was sufficient to sustain the conviction, without reaching the question of whether the *Biggers* factors also favored the State with regard to Draper's and Wright's identifications.

¶ 51    Starks further argues that the inconsistencies between Howard's account and the accounts of Draper and Wright support his contention that the identifications were unreliable. However, those inconsistencies were fully explored at trial during cross-examination and it is the province of the jury to determine the credibility of the witnesses and the weight to be given to each witness's testimony.

¶ 52                              B. Other Crimes Evidence

¶ 53    Starks next contends that the State violated the trial court's ruling excluding other crimes evidence by introducing photographs of multiple weapons and ammunition that had no connection to Shine's murder and commenting on this evidence in closing argument. Starks concedes in his opening brief that he did not object to the introduction of the evidence at trial and did not include it in his posttrial motion, but he asks this court to review the issue under the plain-error exception to normal forfeiture principles.

¶ 54    To preserve a claim of error for review, a defendant must both object at trial and include the alleged error in a posttrial motion. *People v. Thompson*, 238 Ill. 2d 598, 611-12 (2010) (citing *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)). The plain-error doctrine allows a reviewing court to consider an unpreserved error if either: (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error; or (2) the error was so fundamental and of such magnitude that it affected the fairness of the trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Id*. at 613 (citing *Piatkowski*, 225 Ill. 2d at 565). In plain-error review, we must first determine whether an error in fact occurred (*People v. Walker*, 232 Ill. 2d 113, 124-25 (2009)), and the burden of persuasion rests with the defendant (*People v. McLaurin*, 235 Ill. 2d 478, 495 (2009)).

¶ 55    The State argues that Starks' motion *in limine* regarding other crimes evidence was related specifically to evidence that Starks had another murder indictment and a narcotics case pending, and contained no indication that it included a request to bar evidence of the weapons that were recovered at the time of Starks' arrest, nor was any mention made of the weapons during the hearing on the motion. Starks responds that he is arguing that he was prejudiced by the erroneous admission of other crimes evidence, and the motion to bar other investigations and alleged crimes encompassed investigations related to the other weapons that were recovered that had no connection to Shine's murder.

¶ 56    Because the issue was not preserved, the fact that Starks may not have specifically referenced the weapons in his motion *in limine* is not dispositive in our determination of whether the admission of such evidence constituted plain error. Therefore, we must first determine whether the admission of evidence regarding weapons that were not connected to Shine's murder was, in fact, error.

¶ 57    As an initial matter, we do not believe that other crimes principles apply to the evidence in question. While evidence of other crimes committed by the defendant is admissible if it is relevant for any purpose other than to show a propensity to commit crime, it is well settled that before introducing such evidence, the State must show that a crime was committed and that the defendant either committed it or participated in its commission. *People v. Thingvold*, 145 Ill. 2d 441, 455 (1991).

¶ 58    Here, the evidence in question is merely the recovery of multiple weapons, so the relevant crime would be the illegal possession of weapons, but the State presented no evidence that Starks was in possession of the recovered weapons. Starks was not arrested inside the apartment in which the weapons were recovered and did not reside there. Evidence presented regarding Starks' DNA related solely to the murder weapon and no other evidence linking Starks to the remaining weapons was presented. The State presented no direct evidence that Starks was ever in the apartment, such as testimony that Starks was seen entering or leaving the apartment, or evidence that any items shown to belong to Starks were recovered from the apartment. The State merely presented circumstantial evidence of an open window on the third floor that provided access to the rear porch of the building, and evidence that Starks was first observed exiting the rear of the apartment building and running through the alley. Thus, the State did not show that Starks was ever in possession of the weapons in question and this evidence is not properly characterized as other crimes evidence.

¶ 59    However, this does not end our analysis. Our supreme court has held that where evidence is improperly characterized as other crimes evidence, the admissibility of the evidence should be judged under ordinary relevancy principles. *People v. Pikes*, 2013 IL 115171, ¶ 20. The *Pikes* court concluded that because the evidence showed the defendant in that case was not involved in the other crime, there was no need to analyze the evidence under terms such as "extrinsic," "intrinsic," or "inextricably intertwined." *Id.* Similarly, we reject the State's contention that the recovery of the weapons concerned acts that were intrinsic to or inextricably intertwined with Shine's murder. The State's argument conflates the recovery of the weapons with the separate crime of possession of the weapons. Thus, as in *Pikes*, we will analyze the evidence under general relevancy principles.

¶ 60    Evidence is generally admissible if it is relevant (Ill. R. Evid. 402 (eff. Jan. 1, 2011)), but even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice (Ill. R. Evid. 403 (eff. Jan. 1, 2011)). Evidence is relevant if it has any tendency to make any fact of consequence to the action more or less probable than it would be without the evidence. Ill. R. Evid. 401 (eff. Jan. 1, 2011).

¶ 61    The State relies on *People v. Williams*, 262 Ill. App. 3d 808 (1994), and *People v. Braxton*, 81 Ill. App. 3d 808 (1980), for the proposition that evidence of weapons recovered at the time of a defendant's arrest constitutes an admissible detail of the arrest. This reliance is misplaced.

¶ 62    The *Williams* court began its analysis by noting that a gun found in a defendant's possession is generally inadmissible unless it has some connection to the crime charged. *Williams*, 262 Ill. App. 3d at 821. In order for the evidence to be admissible, there must be

proof to connect the weapon both to the defendant and to the crime charged. *Id*. (citing *People v. Free*, 94 Ill. 2d 378, 415 (1983)). Evidence that the weapon is suitable for the commission of the crime is sufficient to satisfy the second required element. *Id*.

¶ 63     The problem the State faces here is that, in addition to not meeting either component of the required proof, the State failed to meet the threshold requirement of showing that the weapons were found in Starks' possession. As previously noted, there was no evidence connecting Starks to either of the other weapons recovered from the apartment, and no evidence even connecting Starks to the apartment. There was similarly no evidence connecting either of the other weapons to Shine's murder. In *Williams*, the weapon in question was suitable for the crime charged because there was evidence that three guns had been used and only two bullets had been recovered, so the gun found in the defendant's car at the time of his arrest could have been the third gun used in the offense. *Id*. at 821-22. Here, only one gun was used in Shine's murder and that specific gun had been identified; thus, the remaining weapons could not be considered suitable for the crime charged as the State contends.

¶ 64     The State cites to *Braxton* and a number of other cases in which guns that were found in a defendant's possession at the time of arrest were admissible as details of the arrest, even if the weapons had no connection to the crime charged. These cases are inapposite. Here, once again, the weapons in question were not found in Starks' possession when he was arrested and, thus, are not properly characterized as details of his arrest. Starks was stopped because he was seen running in an alley behind an apartment building in January wearing a T-shirt and no shoes when the police were in the process of pursuing other suspects for unrelated crimes. When Starks gave his name to the officer who stopped him, she recognized that there was an investigative alert for his arrest and he was taken into custody. No weapons were found on Starks and no direct evidence linked Starks to the location where the weapons were recovered, an apartment searched by the police during the course of their pursuit of at least one other individual with no demonstrated connection to Starks. It was only after testing determined that one of the guns was used to kill Shine that an attempt was made to link that particular weapon to Starks through DNA testing. Thus, none of the weapons, including the gun that was later determined to have been used in Shine's murder, were admissible as details of Starks' arrest. Detective McKendry's testimony was relevant only to explain why the police were inside that particular apartment building and how they came to recover the weapon that was ultimately connected to Shine's murder.

¶ 65     Because Starks was never shown to be in possession of the weapons in question, the general rule regarding the admissibility of weapons found in a defendant's possession does not apply. Moreover, the State did not offer any proof that the weapons were connected to Starks in any other way, or that the weapons were used in Shine's murder. Under general relevancy principles, it is clear that the evidence related to the other weapons does not have any tendency to make any fact of consequence more or less probable, thus, we need not reach the issue of whether the evidence was more prejudicial than probative. The introduction of evidence relating to the other weapons recovered was error because the evidence simply had no relevance to this case.

¶ 66     Considering the first prong of the plain-error doctrine, we conclude, after careful review of the record, that the evidence in this case was closely balanced. The DNA evidence, even when viewed in the light most favorable to the State, simply established that Starks could not be excluded as a contributor to DNA from at least three contributors found on the murder weapon

two months after Shine's murder. The evidence against Starks consisted primarily of the testimony of three eyewitnesses who provided inconsistent accounts, only one of whom identified Starks in both the photo array and the physical lineup. The State emphasized the erroneously admitted evidence in closing argument, noting that the police recovered a "stash of weapons" and a "drawer full of ammo" from the building Starks was seen running from in his shirt sleeves and bare feet. It is clear from the trial court's comments at sentencing just how prejudicial this evidence was to Starks. The trial court stated at sentencing that Starks had been found in possession of "a fearful looking arsenal of guns," a statement that did not accurately reflect the evidence presented at trial and demonstrated how even the trial judge was influenced by the erroneous admission of the other weapons evidence. Therefore, we conclude that the introduction of evidence related to other weapons that had no connection to Starks or to Shine's murder constituted reversible error under the first prong of the plain-error doctrine. We reverse Starks' conviction and remand for a new trial. However, because the remaining issues are likely to arise on retrial, we will address them briefly.

¶ 67                     C. Expert Testimony on Eyewitness Identification

¶ 68        Starks contends that the trial court abused its discretion in summarily rejecting his request to allow expert testimony concerning the reliability of eyewitness identification without considering the relevance and weight of the proffered testimony. Although we agree, as discussed below, that the trial court failed to give serious consideration to the request to present expert testimony on the reliability of eyewitness identifications (and the motion Starks ultimately filed may have been influenced by the trial court's categorical rejection of the relevance of such testimony), we note that Starks' motion was nonspecific either as to the identity of the expert or the topics of his or her testimony other than the fact that stress and the presence of a weapon can affect memory. See Ill. S. Ct. R. 413(c) (eff. July 1, 1982) (requiring disclosure on written motion of expert reports and qualifications). In his brief on appeal, Starks raises other issues he claims such an expert would address but, of course, we are unable to comment on these as they are not included in the record. And even though the attitude toward such expert testimony is shifting in favor of admissibility, it is nevertheless the proponent's initial burden to establish the relevance of the proffered testimony in the context of a particular case (*People v. Jordan*, 103 Ill. 2d 192, 208 (1984)).

¶ 69        It is well settled that a trial court has broad discretion in determining the admissibility of expert testimony. *People v. Enis*, 139 Ill. 2d 264, 290 (1990). However, in the exercise of that discretion, a trial court should carefully consider the necessity and relevance of the expert testimony in light of the facts of the particular case, and should balance the probative value of such testimony against its unfairly prejudicial effect. *Id*.

¶ 70        Here, although the trial court stated at the hearing on the posttrial motion that it had read at least some of the documentation Starks submitted, there is no indication in the record that the trial court's ruling was based on a consideration of the relevance of the proffered testimony in light of the facts of this particular case. In fact, the record supports the opposite conclusion. The trial court initially informed Starks that his motion to allow the expert testimony would be denied before it was even filed, an obvious indication that the trial court's decision was based on the trial judge's expressed view that expert testimony on the issue of eyewitness identification is never relevant, regardless of the facts of a particular case. The trial court clearly indicated it would summarily deny the motion without consideration of the facts before

the motion was even filed, stating: "Denied. It's nonsense." After the motion was filed, the trial court gave reasons for its denial of the motion, but again those reasons were stated in general terms regarding the trial court's view of what a layperson can understand, noting that this issue "has come up from time to time."

¶ 71 Contrary to the trial court's assertion, this court has noted that numerous studies in the area of eyewitness psychology indicate there is significant potential for eyewitness error and jurors have misconceptions about the abilities of eyewitnesses and the reliability of their testimony. *People v. Tisdel*, 338 Ill. App. 3d 465, 467 (2003). In *People v. Allen*, 376 Ill. App. 3d 511, 526 (2007), this court reversed the defendant's conviction and remanded the case for a new trial where the trial court did not conduct a meaningful inquiry into the proposed eyewitness expert testimony under the specific circumstances of the case. More recently, in *People v. McGhee*, although we noted that the trend in Illinois has been to preclude expert testimony on the reliability of eyewitness identification, we commented that "[t]he efficacy of eyewitness identification testimony and current safeguards regarding its reliability is one of the most cutting-edge topics in modern criminal procedure, and the law is rapidly evolving." *People v. McGhee*, 2012 IL App (1st) 093404, ¶ 53.

¶ 72 The importance of considering the specific circumstances of the case is illustrated by the facts here, where no direct physical evidence links the defendant to the crime and the State's case consists primarily of the eyewitness testimony of three individuals who did not know the defendant, gave a very general description of the shooter, and gave conflicting accounts of important details such as whether the shooter walked or ran away and who walked over to the victim after the shooting. None of the eyewitnesses had the opportunity to observe Starks for more than a few seconds and all did so under stressful circumstances. Courts across the country have recognized that, contrary to longstanding assumptions, fallibilities in eyewitness identifications are not readily understood by juries and that expert testimony on such subjects as (i) the weak correlation between a witness's confidence in his or her identification and its accuracy, (ii) how the presence of a weapon can diminish the reliability of an identification, and (iii) how stress at the time of observation can render a witness less able to retain an accurate perception and memory of the event, can assist the jury in evaluating such evidence without usurping the jury's factfinding function. See *State v. Guilbert*, 49 A.3d 705, 721-22 (Conn. 2012) (collecting cases). Because we are already reversing on other grounds, we hold that on remand, Starks' request to present expert testimony on eyewitness identification must be given serious consideration under the specific facts of this case.

¶ 73 D. Motion to Suppress

¶ 74 Starks also contends that the trial court erred in denying his motion to suppress the identification evidence from the three lineups. Starks argues that the denial was a violation of due process and his right to counsel. While Starks only sought to suppress the third identification at trial, he argues on appeal that there is no evidence in the record that he knowingly and intelligently waived his sixth amendment right to counsel for purposes of the lineups. However, the State correctly notes that the right to counsel must be invoked, and the record is clear that Starks did not invoke his right to counsel until after the first two lineups had taken place.

¶ 75 An individual's sixth amendment right to counsel attaches "only at or after the time that adversary judicial proceedings have been initiated against him." *Kirby v. Illinois*, 406 U.S.

682, 688 (1972). Starks contends that because the Supreme Court stated in *Rothgery v. Gillespie County, Texas*, 554 U.S. 191, 198-99 (2008), that the sixth amendment right to counsel attaches when a defendant initially appears before a judge to learn the charge against him, regardless of whether the prosecution is involved, that the right attaches when an arrest warrant is issued. Starks acknowledges that no Illinois court has yet interpreted *Rothgery* to find that the issuance of an arrest warrant triggers the sixth amendment right to counsel.

¶ 76    We decline Starks' invitation to revisit this issue in light of *Rothgery* on the facts of this case. No arrest warrant was issued for Starks; thus, there was no judicial involvement in adversary proceedings against him. Starks acknowledges that he was arrested on an investigative alert but contends that if we do not hold that an investigative alert also triggers the sixth amendment right to counsel, we allow the State to circumvent both the warrant requirement and the sixth amendment right to counsel. But even if we equate an investigative alert with an arrest warrant, this court has found that the sixth amendment right to counsel does not attach at a lineup conducted prior to the initial appearance before a judge. *People v. White*, 395 Ill. App. 3d 797, 822 (2009) (recognizing that under the federal standard reaffirmed in *Rothgery* " 'an accusation filed with a judicial officer is sufficiently formal, and the government's commitment to prosecute it sufficiently concrete, when the accusation prompts arraignment and restrictions on the accused's liberty to facilitate the prosecution' " and finding that defendant's sixth amendment right to counsel had not attached at lineup conducted prior to presentment to a judicial officer (quoting *Rothgery*, 554 U.S. at 207)).

¶ 77    We reiterate previously expressed concerns over the use of investigative alerts in place of arrest warrants. Both the United States and Illinois Constitutions provide for the use of warrants, issued on probable cause and supported by affidavit. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. See *Wong Sun v. United States*, 371 U.S. 471, 481-82 (1963) ("The arrest warrant procedure serves to insure that the deliberate, impartial judgment of a judicial officer will be interposed between the citizen and the police, to assess the weight and credibility of the information which the complaining officer adduces as probable cause."). The use of investigative alerts, which allow police, without judicial oversight, to make probable cause determinations, which are then used as a basis to arrest the subject of the alert, bypasses these important constitutional protections. See *People v. Hyland*, 2012 IL App (1st) 110966, ¶ 51 ("Allowing the practice of investigative alerts to continue to side-step judicial review gives arrest warrant power to the police, and constitutes an impermissible violation of the suspect's constitutional rights." (Salone, J., specially concurring, joined by Neville, J.)). We can easily envision circumstances where a court's later assessment of the existence of probable cause differs from the police, thus jeopardizing the results of a criminal investigation. But that is not the case here. Given the existence of three eyewitness identifications of Starks prior to the issuance of the investigative alert, there clearly existed probable cause for his arrest. Therefore, whether the failure of the police to obtain an arrest warrant and instead pursue an individual via an investigative alert poses issues of constitutional dimension must await another case. The trial court did not err in denying the motion to suppress.

¶ 78                    E. Supreme Court Rule 431(b) and Mittimus Correction

¶ 79    Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) requires the trial court to ask prospective jurors whether they "understand" and "accept" that: (1) the defendant is presumed innocent; (2) the State must prove the defendant guilty beyond a reasonable doubt; (3) the

- 15 -

defendant is not required to offer any evidence; and (4) the defendant's failure to testify cannot be held against him. The State concedes that the trial court's failure to ask whether the venire understood the principles constitutes error under our supreme court's holding in *People v. Wilmington*, 2013 IL 112938, ¶ 32. Again, because we are reversing on other grounds, we need not address whether this error alone–or in conjunction with other errors–would warrant reversal. Thus, on remand, the trial court needs to ask prospective jurors whether they both understand *and* accept the principles, not merely whether they accept them.

¶ 80    Finally, because we are reversing defendant's conviction and remanding for a new trial, we need not order that the mittimus be corrected.

¶ 81                                          CONCLUSION

¶ 82    For the reasons stated, we reverse defendant's conviction and remand for a new trial. Because we have concluded that the evidence was sufficient to convict defendant of first degree murder, no double jeopardy impediment to retrial is present. See *People v. Ward*, 2011 IL 108690, ¶ 50.

¶ 83    Reversed and remanded.

¶ 84    PRESIDING JUSTICE HYMAN, specially concurring.

¶ 85    How trustworthy are eyewitness identifications? The New Jersey Supreme Court concluded there was "a troubling lack of reliability in eyewitness identifications." *State v. Henderson*, 27 A.3d 872, 877 (N.J. 2011). Empirical evidence reveals eyewitness identification to be "the single greatest cause of wrongful convictions in this country." (Internal quotation marks omitted.) *Perry v. New Hampshire*, 556 U.S. 1, ___, 132 S. Ct. 716, 738 (2012) (Sotomayor, J., dissenting). The Oregon Supreme Court found the handling of eyewitness identifications "incomplete and, at times, inconsistent with modern scientific findings." *State v. Lawson*, 291 P.3d 673, 688 (Or. 2012). The Supreme Judicial Court of Massachusetts stated, " '[e]yewitness identification of a person whom the witness had never seen before the crime or other incident presents a substantial risk of misidentification and increases the chance of a conviction of an innocent defendant.' " *Commonwealth v. Silva-Santiago*, 906 N.E.2d 299, 311 (Mass. 2009) (quoting *Commonwealth v. Jones*, 666 N.E.2d 994, 1000 (Mass. 1996)). This court observed that research belies "the claim that the jury does not require expert assistance," and "[n]umerous studies in the area of eyewitness psychology indicate there is a significant potential for eyewitness error and that jurors have misconceptions about the abilities of eyewitnesses." (Internal quotation marks omitted.) *People v. Allen*, 376 Ill. App. 3d 511, 525 (2007).

¶ 86    While the issue of allowing an expert to testify on eyewitness identification will be re-examined on remand, the subject of eyewitness identification generally deserves attention and reform. I write separately to urge that the State of Illinois join the growing number of states adopting comprehensive changes to their eyewitness identification procedures. Underscoring the urgency for systemic reforms in Illinois is our state's appalling and well-known record on wrongful convictions. The current system is unacceptable in a society devoted to the notion that a fair trial is the birthright of all people.

¶ 87    Federal and state courts have become increasingly more critical of eyewitness identification procedures and evidence. See, *e.g.*, *Young v. Conway*, 715 F.3d 79, 81 (2d Cir. 2013) (acknowledging scientific studies indicate certain circumstances surrounding a crime may impair witness's ability to accurately process what he or she observed. Because many of the factors are counterintuitive, the court "concluded that it was a good idea to make trial judges aware of the existence of this information, in effect, as additional tools to help them with their work"); *United States v. Greene*, 704 F.3d 298, 305 (4th Cir. 2013) (addressing impermissibly suggestive procedure used to obtain an in-court identification); see also *State v. Avery*, 2013 WI 13, ¶ 114, 345 Wis. 2d 407, 826 N.W.2d 60 (Bradley, J., dissenting, joined by Abrahamson, C.J.) ("[t]his court has been critical of the reliability of eyewitness identification testimony, observing that studies confirm that eyewitness testimony is often 'hopelessly unreliable' "); *Tillman v. State*, 354 S.W.3d 425, 441 (Tex. Crim. App. 2011) ("[E]yewitness identification has continued to be troublesome and controversial as the outside world and modern science have cast doubt on this crucial piece of evidence. *** [A] vast body of scientific research about human memory has emerged. That body of work casts doubt on some commonly held views relating to memory."); *State v. Clopten*, 223 P.3d 1103, 1108 (Utah 2009) ("Empirical research has convincingly established that expert testimony is necessary in many cases to explain the possibility of mistaken eyewitness identification." (Capitalization removed.)); *Brodes v. State*, 614 S.E.2d 766, 771 (Ga. 2005) (holding juries cannot be instructed to consider a witness's level of certainty when assessing the reliability of an identification because of the "scientifically-documented lack of correlation between a witness's certainty in his or her identification of someone as the perpetrator of a crime and the accuracy of that identification").

¶ 88    Similarly, Justice Sotomayor, the only Justice to serve as a trial judge, noted that her court "has long recognized" inherent deficiencies in eyewitness identifications, "their unreliability, susceptibility to suggestion, powerful impact on the jury, and resistance to the ordinary tests of the adversarial process–can undermine the fairness of a trial." *Perry v. New Hampshire*, 565 U.S. 1, ___, 132 S. Ct. 716, 730-31 (2012) (Sotomayor, J., dissenting). Specifically, Justice Sotomayor pointed out that in an eyewitness identification (i) witnesses were highly susceptible to distortion by post event information or social cues, (ii) jurors regularly overestimate the accuracy of eyewitness testimony, (iii) jurors overwhelmingly favor the testimony of eyewitnesses who project confidence even though confidence is a poor gauge of accuracy; and (iv) suggestiveness can stem from sources other than police-orchestrated procedures. *Id*. at ___, 132 S. Ct. at 739 (Sotomayor, J., dissenting).

¶ 89    New Jersey modernized its approach after determining, in addition to issues of reliability, its practices did not adequately deter inappropriate police conduct and were too trusting of the jury's ability to evaluate identification evidence. *State v. Henderson*, 27 A.3d 872 (N.J. 2011). The Supreme Court of Oregon in *State v. Lawson*, 291 P.3d 673 (Or. 2012), considered it "imperative" to be informed of current scientific research and literature "because, as an evidentiary matter, the reliability of eyewitness identification is central to a criminal justice system dedicated to the dual principles of accountability and fairness." *Id.* at 685. The Massachusetts high court formed a study group which issued "scientifically grounded recommendations *** geared toward reducing juror confusion and increasing judicial involvement in implementing procedures and remedies" that "reduce the risk of wrongful convictions." Report and Recommendations to the Justices, Supreme Judicial Court Study

Group on Eyewitness Evidence (July 25, 2013), http://www.mass.gov/courts/docs/sjc/docs/eyewitness-evidence-report-2013.pdf, at 5, 11 (last visited on May 15, 2014); see also N.C. Gen. Stat. § 15A-284.50 *et seq*. (2007) (Eyewitness Identification Reform Act).

¶ 90 The *Henderson* opinion issued by the New Jersey Supreme Court should be required reading for every law enforcement officer, prosecutor, criminal defense attorney, and judge interested in ensuring fairness and integrity in the criminal justice system. Just one example. On juror decision-making, the court stated:

> "We presume that jurors are able to detect liars from truth tellers. But as scholars have cautioned, most eyewitnesses think they are telling the truth even when their testimony is inaccurate, and '[b]ecause the eyewitness is testifying honestly (i.e., sincerely), he or she will not display the demeanor of the dishonest or biased witness.' *See* Jules Epstein, *The Great Engine that Couldn't: Science, Mistaken Identity, and the Limits of Cross-Examination*, 36 *Stetson L. Rev.* 727, 772 (2007). Instead, some mistaken eyewitnesses, at least by the time they testify at trial, exude supreme confidence in their identifications." *Henderson*, 27 A.3d at 889.

For present purposes, suffice it to say that *Henderson* provides one state's thoughtful effort to apply psychological sciences to the legal system so as to prevent and correct wrongful convictions.

¶ 91 When something is wrong, you figure out how to get it right. The flaws inherent in Illinois's eyewitness identification jurisprudence will continue to haunt Illinois courtrooms until they are faced and fixed.

¶ 92 The criminal justice system of Illinois can ill afford an antiquated approach in the face of the empirical research, legal commentaries, and court opinions, not to mention a number of wrongful convictions based on eyewitness identification. Every wrongful conviction due to faulty eyewitness identification testimony diminishes the legitimacy of the criminal justice process and all of us who are a part of the process–law enforcement, prosecutors, defense attorneys, and judges. By clinging to the current ways, Illinois risks more egregious mistakes; mistakes that feed cynicism and erode public confidence in our criminal justice system.

¶ 93 In the words of New Jersey Chief Justice Rabner in *Henderson*, "At the core of our system of criminal justice is the 'twofold aim … that guilt shall not escape or innocence suffer.' " *Henderson*, 27 A.3d at 928 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). Innocence in Illinois has suffered enough.

¶ 94 JUSTICE PUCINSKI joins in this special concurrence.