2022 IL App (1st) 190587-U

FIRST DISTRICT,
FIRST DIVISION
April 25, 2022

No. 1-19-0587

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| v. | ) | No. 10 CR 03064 |
| | ) | |
| BRANDON STARKS, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Hyman and Justice Walker concurred in the judgment.

**ORDER**

¶ 1     *Held*: Other-crimes evidence regarding an unrelated murder, bank robbery, and narcotics sale operation was not admissible for any proper purpose and its admission was prejudicial error requiring reversal.

¶ 2     In 2012, defendant Brandon Starks was convicted of first-degree murder in the November 3, 2009 shooting death of Robert Shine. At defendant's first trial, the State violated the trial court's ruling on other-crimes evidence by introducing testimony and photos of firearms and ammunition unrelated to Shine's murder. On appeal, we held that the State had failed to show

that two other firearms and ammunition recovered in the apartment where the murder weapon was recovered were connected to Shine's murder or to the defendant. We also held that the State had failed to show any connection between defendant and the apartment. *People v. Starks*, 2014 IL App (1st) 121169, ¶¶ 63-65. Defendant's conviction for first-degree murder was reversed and the cause was remanded for a new trial.

¶ 3    On remand, the State introduced evidence that defendant had used the other firearms recovered in the apartment in an unrelated shooting and bank robbery—conducting what amounted to mini-trials on unrelated offenses. Defendant was again convicted of Shine's murder. In this appeal, defendant alleges that the trial court erred in allowing (1) other-crimes evidence unrelated to Shine's murder and (2) inculpatory statements made in violation of his sixth amendment right to counsel. For the reasons that follow, we reverse and remand for a new trial.

¶ 4                                    BACKGROUND

¶ 5    At approximately 10 a.m. on November 3, 2009, Robert Shine was shot and killed near 79th and St. Lawrence Streets in Chicago. Because we fully set forth the facts from defendant's first trial in *Starks*, 2014 IL App (1st) 121169, ¶¶ 3-37, we recite only those facts necessary to the issues raised in this appeal.

¶ 6    Three eyewitnesses identified defendant as the shooter. Bailey Wright was walking toward 79th and St. Lawrence when he heard several gunshots. He saw defendant chasing after Shine while firing a gun. Shine was hit and fell to the ground; defendant stood over him and shot him five more times. Geraldine Howard also saw defendant chasing Shine while firing at him, and firing additional shots at him after he fell to the ground. Ronald Draper had just exited his car when he heard gunshots. He ducked down behind his car and heard several more shots. When

he stood up, he saw defendant putting a semiautomatic gun in his pocket as he walked away from the scene.

¶ 7        A few days after the shooting, Shine's mother, Andrea Reed, notified police that she had received an anonymous voice mail message that someone named "Turd" shot her son. Police connected the name "Turd" to the defendant and assembled a photo array that included his picture. Wright and Howard each identified defendant in the photo array as the shooter. Draper thought he recognized defendant but told the police he wanted to see an in-person lineup. The police issued an investigative alert for defendant.

¶ 8        The evidence introduced at defendant's first trial also established that on January 6, 2010, Detectives Lorne Gushinere and Brian McKendry were looking for Dushawn Powell, a suspect in an unrelated case. While conducting surveillance of an apartment building in the vicinity of 80th Street and Ellis Avenue, they observed Powell with another individual. McKendry pursued them into the building. Gushinere drove to the alley behind the building and saw two men (later identified as defendant and Derrick Boyd) exit the rear of the building and run through the alley. Though it was January, defendant was wearing a T-shirt and no shoes. After a brief chase, both men were detained.

¶ 9        Inside the building, McKendry heard footsteps and the sound of doors slamming above him. He went upstairs and saw that the window on the landing leading to the third floor was open and the door to apartment 3 North was ajar. Although no one was inside the apartment, he observed a .45 Glock and two other firearms on the kitchen counter. Ballistics testing later confirmed the .45 Glock was the gun used to murder Shine. DNA testing on the .45 Glock revealed a mix of at least three DNA profiles (and possibly more).

¶ 10        Katrina Gomez testified as a DNA expert. Gomez "was able to identify a major male contributor, meaning that one person contributed his DNA at a higher level than other persons who also handled the weapon." *Starks*, 2014 IL App (1st) 121169, ¶ 30. She determined that defendant could not be excluded as the contributor. With regard to "how rare the profile from the handgun would be in the general population," Gomez testified that approximately 1 in 15 quadrillion unrelated black individuals could not be excluded from having contributed to the profile. *Id.*

¶ 11        Following defendant's arrest, Howard and Draper viewed an in-person lineup and identified defendant as the shooter. Although Wright did not initially identify anyone, it "dawned on [him]" within minutes that the first lineup participant, *i.e.*, defendant, was the shooter.

¶ 12        Defendant was convicted of first-degree murder. On direct appeal, we held that the introduction of evidence regarding the other firearms found in the apartment was plain error. *Starks*, 2014 IL App (1st) 121169. We found that "the State did not offer any proof that the weapons were connected to [defendant] in any other way, or that the weapons were used in Shine's murder. *** [T]he evidence simply had no relevance to this case." *Id.* ¶ 65. The evidence properly admitted at trial consisted "primarily" of eyewitness accounts and DNA connecting defendant, and at least two others, to the murder weapon discovered two months after Shine's murder. *Id.* ¶ 66. Considering the first prong of the plain-error doctrine, we concluded that the evidence was closely balanced and remanded for a new trial. *Id.* ¶ 66.

¶ 13        On remand, the State moved to introduce additional evidence in order to correct "the appellate court's faulty premise *** that the defendant had not been connected to the apartment," arguing that defendant used the second gun recovered in the apartment, a .40 Glock, in the shootings of Cody Miller and Raymond Marlow on January 3, 2010, and the third gun recovered,

a 9-millimeter Cobray M-11, to commit a bank robbery at Midwest Bank in Country Club Hills on December 22, 2009. The State also argued that evidence of defendant's DNA on cocaine recovered in the apartment linked him to the apartment and was relevant to establish identity (because defendant was presumably in possession of all three guns and the cocaine within a relatively short time after Shine's murder), absence of mistake, and *modus operandi* (since the Shine shooting was similar to the Miller/Marlow shooting).

¶ 14      Over defendant's objection, the trial court held that the additional evidence could be introduced, stating, in part:

> "I do think, when identification is the issue and we can show multiple items that he's got relationship to in one place with the murder items in this case, that it does become more probative than prejudicial. I don't think that we're assaulting the appellate court's opinion that they rendered because the situation has changed dramatically since the appellate court ruled on this case."

¶ 15      At the second trial, Detective McKendry testified that he entered apartment 3N and observed three guns on the kitchen countertop—a .45 semiautomatic handgun, a .40 caliber gun, and a 9-millimeter semiautomatic gun, all with extended magazines. He also recovered four boxes of ammunition and 86 baggies containing suspect narcotics. Chemical testing of one bag revealed the presence of cocaine. DNA testing of the bags revealed a mix of human DNA originating from at least two people. A major male profile was identified from which defendant could not be excluded. One in 20 quadrillion unrelated blacks, 1 in 2.5 quadrillion unrelated whites, and 1 in 9.1 quadrillion unrelated Hispanics could not be excluded as donors.

¶ 16    Investigator Stephen Strezepek testified that he recovered two bags near Shine's body at the crime scene. Chemical testing revealed that one bag contained marijuana and the other held 17 smaller knotted bags containing cocaine.

¶ 17    Marlow testified that at 2:12 p.m. on January 3, 2010, he and his friend Miller were sitting in a car at 77th and Champlain. An individual approached the car with "a big old gun" with an extended magazine and opened fire. As Marlow started to drive away, the car got stuck on ice. The gunman fired multiple shots through the rear windshield before Marlow got the car moving again. After driving a few blocks, Marlow stopped the car and saw that Miller had been shot in the head. Both men sustained multiple gunshot wounds, and Miller died early the next morning.

¶ 18    Marlow identified defendant as the shooter in a January 9 photo lineup and a February 1 physical lineup. At trial, he testified that he "wasn't paying attention" to the shooter's appearance because he was focusing on the gun. Ballistics expert Marc Pomerance testified that the 17 fired cartridge cases and 2 bullets recovered at the scene of the Miller/Marlow shooting were all fired from the .40 Glock (one of the two other guns recovered from apartment 3N).

¶ 19    FBI Special Agent Brian Wentz testified that he was assigned to investigate a bank robbery that occurred at First Midwest Bank in Country Club Hills on December 22, 2009. During his investigation, he learned that the van used in the robbery was owned by Andre Philpotts, who told Wentz that he had recently sold the van to a man named "Turd." Wentz learned defendant's nickname was "Turd" and interviewed him on January 27, 2010. After being advised of his rights, defendant admitted robbing the bank along with "his recent arrestee" (whom Wentz assumed was Derrick Boyd) and another man named Kid. Wentz showed defendant a wanted poster for the bank robbery that included photos from the surveillance video,

and defendant identified himself in the photos. Defendant told Wentz that the gun he was holding in one of the photos was "recently seized by the Chicago Police Department." Wentz testified that the gun "appears to be the same weapon" as one of the guns photographed in apartment 3N, though he did not know the gun's make and model or how common it was.

¶ 20     Defendant did not testify in his own defense but called three witnesses. Dr. Aaron Benjamin, an expert in the field of identification and memory, explained the phases of memory and how witnesses can miss details and incorrectly remember events. Benjamin testified that stress, "weapon focus," and brevity of observation time can decrease a witness's quality of encoding an experience. An original memory can change based on post-event information, and failure to employ double-blind lineup procedures may contribute to faulty and false memories.

¶ 21     Dr. Karl Reich, an expert in forensic DNA analysis, was retained to review the DNA analysis performed in this case. He identified at least four contributors to the DNA sample recovered from the Shine murder weapon, explaining that determining a major contributor is subjective and can vary from analyst to analyst. According to Reich, it is "very difficult, sometimes impossible" to "tease apart" DNA mixtures to identify separate DNA profiles due to "allele stacking," which occurs when a mixture of DNA is "superimposed on top of each other." Reich also testified that the DNA testing conducted on the drug baggies was based on an extremely small amount of genetic material (less than half a nanogram of DNA, about 60 to 65 cells) which he characterized as "the bottom of what's reliable." Such a small amount makes analysis more difficult because it is more challenging to parse out inherent noise and artifacts. Reich agreed that there was a major male profile on both the .45 Glock and the 70 drug baggies from which Starks could not be excluded as a contributor.

¶ 22    Retired Chicago police detective Sylvia Van Witzenburg testified that she was assigned to investigate an aggravated battery with a firearm that occurred on December 29, 2009 in the area of 7508 South Saint Lawrence Avenue. She spoke to the victim, Eddie Kitchen, in the hospital, and subsequently issued an investigative alert for DuShawn Powell. When the .40 Glock was recovered on January 6, 2010, Witzenburg requested a ballistics comparison with spent cartridges and cartridge casings recovered from the scene of the Kitchen shooting. (The record does not reflect the results of that comparison.) Powell was eventually convicted of the Kitchen shooting.

¶ 23    The jury found defendant guilty of the first-degree murder of Shine and of personally discharging the firearm that caused Shine's death. The trial court sentenced defendant to 50 years' imprisonment, including a 25-year firearm enhancement.

¶ 24                                   ANALYSIS

¶ 25    Defendant argues that his conviction must be reversed because the trial court improperly allowed the introduction of (1) other-crimes evidence regarding the December 22, 2009 bank robbery, the January 3, 2010 shootings, and the firearms, narcotics, and narcotics packaging found in apartment 3N and (2) inculpatory statements defendant made to FBI Special Agent Wentz outside the presence of his counsel.

¶ 26                             Other-Crimes Evidence

¶ 27    Admission of other-crimes evidence is within the trial court's discretion and will not be disturbed absent an abuse of that discretion. *People v. Richee*, 355 Ill. App. 3d 43, 51 (2005). Generally, other-crimes evidence is inadmissible to show defendant's propensity to commit crime. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011); *Richee*, 355 Ill. App. 3d at 50-51. "Such evidence overpersuades the jury, which might convict the defendant only because it feels he or she is a bad

person deserving punishment." *People v. Lindgren*, 79 Ill. 2d 129, 137 (1980). Other-crimes evidence may be offered for any other purpose to which it is relevant, such as establishing defendant's *modus operandi*, intent, motive, identity, or absence of mistake. *People v. Pikes*, 2013 IL 115171, ¶ 11. "However, even where relevant, the evidence should not be admitted if its probative value is substantially outweighed by its prejudicial effect." *Id.*

¶ 28     Our supreme court has cautioned that other-crimes evidence should not result in an improper "mini-trial" on the other offenses. *People v. McKibbins*, 96 Ill. 2d 176, 186-87 (1983). Here, nine of the State's 20 witnesses testified about the other-crimes evidence in whole or in part. Detective McKendry testified in detail about recovering the other two firearms, the boxes of ammunition, suspect narcotics, and narcotics packaging from the apartment. Several forensic scientists were called to discuss latent print analysis, chemical analysis, and DNA sample analysis of those items. Marlow testified about the January 3 shooting. A forensic investigator testified as to his processing of the Miller/Marlow crime scene. A firearms identification expert analyzed ballistics evidence from that scene, and the parties stipulated to the results of Miller's autopsy report. Special Agent Wentz thoroughly described his investigation of the bank robbery, including obtaining defendant's confession.

¶ 29                              Circumstances of Arrest

¶ 30     Citing *McKibbins*, 96 Ill. 2d at 183, the State argues that other-crimes evidence was admissible to explain the circumstances of defendant's arrest, showing how police recovered the murder weapon and how defendant was connected to it. In *McKibbins*, defendant was charged with armed robbery and murder of a parking lot attendant. A rare coin had been taken from the victim's person, and the victim's body was found handcuffed with handcuffs that had the word "STOP" printed on them. *Id.* at 180. Two days after the murder, defendant was arrested while

robbing a jewelry store. The arresting officer searched defendant and found a rare coin that matched the description of the coin taken from the victim. *Id.* at 181. The officer also found two pairs of handcuffs with the word "STOP" on the ground. Under these circumstances, it was proper for the State to introduce evidence regarding the jewelry store robbery, because "[i]t would be difficult to explain or describe circumstances surrounding the defendant's arrest without introducing a substantial amount of the evidence concerning the jewelry robbery." *Id.* at 183. This evidence was also relevant to explain how the police recovered the coin and handcuffs which linked defendant to the murder. *Id.* at 184-85.

¶ 31    In contrast, "other-crimes" evidence regarding the bank robbery on December 22, 2009 and the shooting on January 3, 2010 did not explain or describe the circumstances of defendant's arrest on January 6, 2010 or connect him to Shine's murder. Similarly, the other firearms, ammunition, and cocaine recovered from apartment 3N did not link defendant to Shine's murder. The State argues that it would have been infeasible to entirely exclude the other firearms evidence, since police photographs of the scene showed that all three weapons were "piled together" on the kitchen counter when they were recovered. Introducing detailed testimony about the other weapons and ammunition and calling multiple experts to testify about the recovered narcotics far exceeded what was necessary to show how the murder weapon was recovered.

¶ 32                                Identity

¶ 33    The State asserts that other-crimes evidence was relevant to establish identity because it showed defendant's connection to the apartment where the Shine murder weapon was recovered. Since defendant's connection to the murder weapon was overwhelmingly established by DNA evidence, the probative value of other-crimes evidence admitted in this case was substantially outweighed by its prejudicial effect. See *Pikes*, 2013 IL 115171, ¶ 11.

¶ 34                                          Motive

¶ 35        The State argues that "defendant's participation in a drug packaging operation was

relevant to defendant's motive for killing *** Shine," since narcotics packaged for sale were

recovered near Shine's body. There is no evidence that Shine's murder was drug-related.

Accordingly, we decline the State's invitation to speculate that Shine *may* have been involved in

a drug-dealing operation that *may* have motivated defendant to kill him. "Other-crimes evidence

cannot be admitted if the grounds for establishing its relevance are speculative." *Lindgren*, 79 Ill.

2d at 140.

¶ 36                                    Absence of Mistake

¶ 37        The evidence clearly established that the offender pursued and shot Shine and continued

shooting him once he fell to the ground. Defendant's sole defense was that he was misidentified

as the shooter. Since absence of mistake was not an issue in this case, other-crimes evidence was

not admissible to show absence of mistake.

¶ 38                                    *Modus Operandi*

¶ 39        Finally, the State argues that evidence relating to the Miller/Marlow shooting established

defendant's *modus operandi* based on the factual similarities between the two offenses. For

evidence of another crime to be admissible as *modus operandi*, there must be a "high degree of

identity between the facts of the crime charged and the other offense." (Internal quotation marks

omitted.) *People v. Cruz*, 162 Ill. 2d 314, 348-49 (1994). " 'Much more is demanded than the

mere repeated commission of crimes of the same class, such as repeated murders, robberies or

rapes. The pattern and characteristics of the crimes must be so unusual and distinctive as to be

like a *signature*.' " (Emphasis in original.) *People v. Biggers*, 273 Ill. App. 3d 116, 122 (1995)

(quoting 1 J. Strong, McCormick on Evidence § 190, at 801-03 (4th ed. 1992)). The inference

that the two crimes were committed by the same individual "does not arise where the features linking the two crimes are common to many crimes, including those not committed by the defendant." *Id.*

¶ 40     The Miller/Marlow shooting was not sufficiently similar to the Shine shooting to establish *modus operandi*. Both crimes were committed during the day by an offender who approached his victim or victims on foot and shot them using a gun with an extended magazine. These facts do not establish a unique pattern of criminal behavior. Significantly, Shine was alone and on foot in a commercial district when he was shot, while Miller and Marlow were together in a car in a residential district. In addition, different guns were used in each shooting. The facts of these crimes are not distinctive enough to justify the conclusion that they are the probable handiwork of the same criminal. See *Cruz*, 162 Ill. 2d at 349.

¶ 41     We find that the trial court erred in admitting extensive other-crimes evidence relating to the Miller/Marlow shooting, the bank robbery, and the firearms and narcotics found in apartment 3N. "The erroneous admission of evidence of other crimes carries a high risk of prejudice and ordinarily calls for reversal." *Lindgren*, 79 Ill. 2d at 140. The excessive amount of other-crimes evidence introduced at trial may have influenced the jury to convict defendant out of a belief that he was "a bad person deserving punishment." *Id.* at 137.

¶ 42     The State nevertheless argues that any error was harmless because the evidence was overwhelming. In our view, the properly admitted evidence was not "so overwhelming that no fair-minded jury could have voted for acquittal." *Id.* at 141. Although defendant's connection to the murder weapon was undeniable, he was only one of at least three and possibly more contributors of DNA found on the murder weapon two months after the murder. Here, the State has not met its burden of proving beyond a reasonable doubt that the verdict would have been the

same without the error. See *People v. Quintero*, 394 Ill. App. 3d 716, 728 (2009) (reversing conviction where "[t]he evidence of the defendant's guilt was not overwhelming, and the improper admission of other-offenses evidence may have led the jury to find the defendant guilty").

¶ 43    Defendant additionally argues that the trial court erred in admitting inculpatory statements he made to Special Agent Wentz outside the presence of counsel after his arrest. Specifically, he identified a photo of himself holding a gun during the bank robbery, told Wentz that the gun had been recovered by the Chicago Police Department, and stated that "his recent arrestee" (Boyd, with whom he was arrested on January 6, 2010) also participated in the robbery. Because we have determined that the bank robbery evidence was improperly admitted (see Ill. R. Evid. 404(b) (eff. Jan. 1, 2011)), we need not address this issue.

¶ 44                                CONCLUSION

¶ 45    For the foregoing reasons, we reverse defendant's conviction for the first-degree murder of Robert Shine and remand for a new trial.

¶ 46    Reversed and remanded.