2021 IL App (1st) 171443-U

No. 1-17-1443

Second Division
March 9, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
|  | ) |  |
| Plaintiff-Appellee, | ) |  |
|  | ) | No. 15 CR 380 |
| v. | ) |  |
|  | ) |  |
| DAVID RAMIREZ-MARTINEZ, | ) | Honorable |
|  | ) | Arthur F. Hill, Jr. |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Defendant's murder conviction is reversed and the cause is remanded for a new trial where the trial court abused its discretion in excluding certain statements made by the victim.

¶ 2    On May 14, 1994, 28-year-old Bonnie Boudouvas was murdered in her apartment located in the 3900 block of North Ashland Avenue in Chicago. The cause of death was strangulation with

the contributing factor of two knife wounds to the chest. The killer wrapped the body in towels and placed it in the bathtub along with several other items, including a VCR.

¶ 3    No arrests were initially made, and the case went cold. Over 20 years later, on December 18, 2014, defendant David Ramirez-Martinez was arrested for Bonnie's murder after DNA testing revealed that his blood was co-mingled with Bonnie's on a towel used to clean up the crime scene. Following a jury trial in 2017, defendant was convicted of first-degree murder and sentenced to 60 years in prison. He now appeals, arguing that the trial court wrongfully excluded certain evidence that he claims would have supported his theory that John Boudouvas, Bonnie's soon-to-be ex-husband, was the real killer. Defendant also contends that the trial evidence was insufficient to sustain his conviction. For the following reasons, we find that the trial court erred in excluding evidence. However, because we also find that the evidence was sufficient to sustain a conviction, we reverse and remand for a new trial.

¶ 4                            I. BACKGROUND

¶ 5    Prior to trial, the State filed a motion *in limine* to bar testimony from several of Bonnie's friends regarding statements Bonnie allegedly made to them about her relationship with John, whom she was in the process of divorcing at the time of the murder. In particular, the defense sought to elicit testimony that Bonnie told several friends at various times that John had physically abused her for years, stated that nobody in his family got divorced, and once threatened to kill her if she ever tried to leave him.

¶ 6    Defendant also sought to introduce evidence of Bonnie's statements to friends about arguing with John over purchasing a VCR. Specifically, Carol Fender-Ramirez, who was defendant's wife and Bonnie's longtime friend and roommate, would testify that shortly before the murder Bonnie told her that she and John argued because John refused to give her money to buy a

VCR. Bonnie acquired a VCR on her own and allegedly told Carol that if John asked where she got the money, she was going to tell him to take the VCR and "shove it up his ass." Theresa Napiorkowski, who was Bonnie's friend and former coworker, would testify that Bonnie told her that she and John had an argument about the VCR after which Bonnie told John that it was "none of his business" how she paid for it and "hung up on him."

¶ 7    After a hearing, the trial court ruled that Bonnie's alleged statements to her friends were inadmissible hearsay that "d[id] not contain sufficient indicia of reliability" to be used a trial. However, the court ruled that the witnesses could testify to any instances of abuse or relevant arguments that they witnessed firsthand.

¶ 8    The following evidence was adduced at trial.

¶ 9    Sheila Peyatt, who lived in the apartment below Bonnie and Carol, testified that she noticed water dripping from her ceiling at around 7 p.m. on May 14, 1994. She went upstairs to Bonnie's apartment, which was open, knocked on the bathroom door, and yelled Bonnie's name. At this time, Peyatt noticed that the door to the bedroom, which was directly across from the bathroom, was closed.

¶ 10    Getting no response from Bonnie, Peyatt returned to her own apartment and noticed that the water dripping from the ceiling had turned a "reddish, rusty" color. Peyatt went back up to Bonnie's apartment with her German Shepherd and again knocked on the bathroom door. Peyatt noticed that the bedroom door was now open. Still getting no response from Bonnie, Peyatt again returned to her apartment and called her landlord, Bill Egan. Egan and another man came over about 10 minutes later and forced open the bathroom door, at which point they discovered Bonnie's body in the bathtub. The police were called and arrived shortly thereafter.

¶ 11    John Stella, a retired forensic investigator for the Chicago Police Department, testified that he and his partner responded to the apartment at approximately 7:30 p.m. He processed the crime scene, which included taking photographs and testing for fingerprints. Stella opined that there was no evidence of burglary, as there was no sign of forced entry and the apartment was "[v]ery neat" with many valuables left behind. In court, Stella identified several photographs of the scene, including those showing Bonnie's body lying sideways in the bathtub, wearing one shoe, and covered in towels. The handles of two steak knives are protruding from her left breast, and what appears to be the belt of a bathrobe is tied to the body and the bathtub faucet.[1] Other photographs identified by Stella show a blood-stained white towel on top of a trashcan in the kitchen, which was located between the bathroom and the apartment's back door. On cross-examination, Stella testified that there were no fingerprints suitable for comparison and that there was never a "full length shot" taken of the white towel in the kitchen.

¶ 12    Dr. Melanie Trapani testified as an expert in the field of forensic biology and DNA analysis. In 2013, Dr. Trapani was employed by Orchid Cellmark, a private DNA testing laboratory in Dallas, Texas. Dr. Trapani received the physical evidence in this case from the police along with a DNA profile for Bonnie. She explained that by 2013, DNA testing techniques had improved such that it was now possible to identify DNA from much smaller samples than it was in the past. Dr. Trapani tested the items received from the police and determined that blood on the toilet seat and on two towels found in the bathtub matched Bonnie's DNA.

---

[1] Although many of defendant's arguments on appeal are premised on a VCR being found on top of the body, no photographs in the record show the VCR in the bathtub. However, the State concedes that the VCR was originally found on top of Bonnie's body.

¶ 13 Dr. Trapani also took 14 cuttings from the stains on the white towel found in the kitchen trashcan. Of the 14 cuttings, 11 contained sufficient DNA for testing. Nine of the cuttings matched Bonnie's DNA, and the other two matched an unknown male. Dr. Trapani acknowledged that there was no way she could tell the age of the bloodstains she tested.

¶ 14 Janice Youngsteadt, a forensic analyst for the Illinois State Police, testified as an expert in the field of forensic DNA analysis. Youngsteadt tested defendant's buccal swab, which matched the male DNA found on the two cuttings from the white towel.

¶ 15 Carol testified that she and Bonnie were lifelong friends who moved into the Ashland apartment sometime in October 1993. Bonnie was in the in the process of divorcing John at the time of her murder in May 1994. Carol and defendant were also married at that time, but were separated. Carol explained that throughout their relationship, she and defendant would separate for up to 12 months at time "and then maybe live together a few months, three, four months and then [they] would be separated again." She and defendant always maintained separate addresses. They were still married at the time of trial.

¶ 16 Bonnie and John shared joint custody of their daughter Sandy, who was nine years old when Bonnie was murdered. Sandy lived with Bonnie and Carol during the week, and with John on the weekends.

¶ 17 Carol did not recall John ever being inside the Ashland apartment. When he came to pick up or drop off Sandy, he would wait downstairs while Bonnie watched through the window. When Sandy was with John on the weekends, Bonnie would often stay with her boyfriend, Besnik "Bennie" Mahmedi. Carol also did not recall Bennie ever being inside the apartment, except possibly for Thanksgiving dinner in 1993.

¶ 18   Although defendant never lived in the Ashland apartment, Carol testified that he would sometimes stay with her on weekends when Bonnie was with Bennie. She did not recall exactly when defendant was last in the apartment but knew that it was more than a week before Bonnie's murder. She acknowledged that she told detectives in December 2013 that defendant had not been to the apartment for "approximately three to four months prior to the murder." In May 2014, Carol testified before the Grand Jury that defendant was last in the apartment "[p]robably a few months prior" to Bonnie's murder. After defendant's arrest, he and Carol had several telephone conversations about when he was last in the apartment. The State played for the jury a recording of one such conversation. During that call, defendant stated that he believed he was last in the apartment about a week and a half before the murder. Carol replied that she believed defendant was last there "maybe a month" before the murder based on the timing of certain life events such as her miscarriage and flying to Nashville for her mother's open-heart surgery.

¶ 19   Carol further testified at trial that Bonnie would usually leave the backdoor unlocked, which Carol "[m]ost likely" told defendant at some point. Carol agreed that she told detectives in December 2013 that defendant was aware that the backdoor was often unlocked.

¶ 20   On the day of the murder, which was a Saturday, Carol left the apartment around 9:30 a.m. to go shopping and later went to a nightclub with some friends. She did not tell defendant about going to the club because he would get mad when she went out with friends and she did not want him to follow her. After the club, Carol slept at her friend's house. She learned about the murder when she returned home Sunday morning.

¶ 21   During cross-examination, Carol testified that she told detectives that defendant would spend the night at the Ashland apartment "a couple times a month." She also testified that, immediately before her Grand Jury testimony, she told Detective John Fuller that she "wasn't sure"

when defendant was last in the apartment and "if it was important that not to quote [her] on it." This conversation was later corroborated at trial by the testimony of Phyllis Fender, Carol's sister, but denied by Fuller.

¶ 22    Carol further testified that defendant spent the night at her and Bonnie's previous apartment "a couple" of times, usually showering and shaving in the morning when he did so. Carol also recalled defendant having two or three nosebleeds while at the Ashland apartment. During these occasions, Carol, a trained nurse, would apply ice to the bridge of his nose and "[p]ut some tissue up in the nostril to clot the blood." The last nosebleed that Carol recalled occurred in either January or February 1994.

¶ 23    Carol also stated that Zeus, Bonnie's cat, lived with them on Ashland and would "zoom back and forth throughout the house." However, Carol did not recall Zeus ever scratching defendant. She did not observe any cuts or injuries on defendant when she saw him on the Monday after the murder.

¶ 24    On redirect examination, the State asked Carol when she last visited with defendant. Carol responded, "You mean visit him in jail, correct?" The State then clarified it was referring to their last "face-to-face" visit, and Carol answered that she "visited him at the Cook County Jail" a month or two earlier. Defense counsel objected, and a sidebar was held. During the sidebar, defense counsel moved for a mistrial. The court denied the motion for a mistrial and overruled defense counsel's objection. The court also stated that it would give a limiting instruction, and defense counsel responded that, "Given everything, I would ask that not be given." Nevertheless, the court admonished the jury that, "You've heard about the location of the contact between [Carol] and the defendant, that location in and of itself is not relevant for any issue in this case."

¶ 25 John testified that he and Bonnie separated in December 1992, when he had "a problem with drugs and alcohol." John filed for divorce in early 1993. He stated that their relationship was initially "pretty contentious" after the divorce was filed and that they fought about money "[a]ll the time." However, the relationship had "[v]ery much" improved by the time of Bonnie's murder and they no longer fought. He was aware that Bonnie was dating someone else at the time of the murder and was "happy to see she was going on with her life."

¶ 26 In 1994, John worked at his family's restaurant about one mile away from Bonnie and Carol's apartment. However, he only entered the apartment one time to see Sandy's room when they first moved in. Thereafter, he would wait outside when picking up or dropping off Sandy.

¶ 27 On the day of the murder, John worked from 5 a.m. until sometime between 3 p.m. and 5 p.m. He then picked up Sandy from his mother's house and took her to a carnival in Warren Park on the "far north side of Chicago." They were at the carnival when his sisters arrived and informed him about the murder. John then dropped Sandy off at his mother's house and went to Bonnie's apartment, where he spoke to the police.

¶ 28 On cross-examination, John denied killing or ever hitting Bonnie. He also denied monitoring her behavior or being angry to learn that Bonnie had spent the night with Bennie.

¶ 29 Chicago police detective John Fuller testified that he and his partner, Detective Dino Amato, were assigned to investigate Bonnie's murder in May 2013. By then, advances in technology and a new grant from the federal government increased the police department's ability to discover DNA evidence. In October 2013, Fuller learned that defendant's DNA matched the blood on the white towel found in Bonnie's kitchen trashcan. He interviewed Carol in December 2013 but did not tell her that defendant's blood was found at the scene. During this interview,

Carol told him that defendant was last in the Ashland apartment approximately three months prior to the murder.

¶ 30 Fuller and Amato then met with defendant in April 2014 to obtain defendant's buccal swab as a "confirmatory sample" for the earlier match. At this time, defendant was not aware that his DNA had been discovered at the scene. The detectives also interviewed defendant, a recording of which was introduced into evidence and played for the jury. During the interview, defendant stated that he was only inside the Ashland apartment a total of four or five times, most recently "at least a month" before the murder. He was aware that Bonnie and John argued about purchasing a VCR. Defendant also stated that on the day of the murder, he drank somewhere near Touhy Park before going to work at Michael Jordan's Restaurant, which had since closed.[2]

¶ 31 The State rested, and defendant moved for a directed verdict, which was denied.

¶ 32 The defense began its case-in-chief by calling Angela Harris, Bonnie's longtime friend who had previously lived with Bonnie, John, and Sandy. Harris testified that one night in 1989, John came home intoxicated and asked to hold Sandy, who was then a toddler. When Bonnie refused, they argued, and John went to hit Bonnie. However, Harris stepped in the way and was struck instead. During his cross-examination, John denied that the incident occurred.

¶ 33 The defense then recalled Carol, who testified that she and others went to the Ashland apartment in the days following the murder to sort out Bonnie's belongings. Carol was alone with John in the kitchen when he stuck his hands out and said, "let me show you how it was done" to

---

[2] When asked about the interview at trial, Fuller testified that defendant told him that "the night of the murder he was drinking in the park" and that he "wasn't working on the day of the murder." The State's position on appeal is that defendant stated he was employed by Michael Jordan's Restaurant in May 1994, but did not specify whether or what time he worked on the night of Bonnie's murder. There is no transcript of the interview in the record on appeal, but our interpretation of the video is that defendant stated he drank in the park on the day of the murder before working at the restaurant that night.

Bonnie. Carol asked him "how would you know that," and he responded that police officers frequented his family's restaurant. Carol reported the incident to the detective who was then in charge of the investigation. She later also told Fuller about what John told her. John recalled going to the apartment after Bonnie's funeral, but denied making any statements to Carol in the kitchen. The State called Fuller in rebuttal, who testified that Carol did not tell him about the conversation with John.

¶ 34    Sophia Ramirez and Carmen Ramirez, defendant's sisters, also testified for the defense. They both stated that defendant, with whom they lived at the time of the murder, left for work at Michael Jordan's Restaurant between 1 and 2 p.m. that day and returned home sometime between 11:30 p.m. and 12:30 a.m. Neither observed any cuts or injuries on defendant when he got home. Both stated that defendant had a history of nosebleeds. They were able to recall the dates in question due to their proximity to other memorable events such as their celebration of Mexican Mother's Day, an eclipse, and the birth of their other sister's baby.

¶ 35    Defendant testified that he was still married to Carol, but that their relationship was "off and on." He and Bonnie were not "close," but they got along and never argued. Defendant stated that he would spend the night at Bonnie and Carol's previous apartment "at least once a week," and that he went to the Ashland apartment "[a]t least two times a month" and sometimes slept over. In May 1994, he was employed at Michael Jordan's Restaurant. He would typically leave home around 1 or 2 p.m. to get to his 3 p.m. shift and return sometime around midnight.

¶ 36    On the day of the murder, he got up early and, in accordance with a cultural weekend tradition, went to a restaurant on Clark Avenue for a beer and a meal. He then went to a nearby park to drink another beer or two with some friends. Afterwards, he went home and got ready for

work. He worked his shift and did not leave until he went home around midnight. He did not learn of Bonnie's murder until Carol called him the next day.

¶ 37    Defendant further testified that he had three or four nosebleeds in the Ashland apartment. He also shaved there when he spent the night and would sometimes cut himself. There were "a few times" when he discovered Bonnie's cat scratched him because he would notice blood on his clothes later. He did not recall when he last bled in the apartment.

¶ 38    Defendant also stated that he was last in the apartment "a couple of weeks, but no more than a month" before Bonnie's murder. He recalled the timing because Carol had returned from Nashville, where her mother had open-heart surgery, approximately two weeks before the murder. He denied killing Bonnie.

¶ 39    On cross-examination, defendant acknowledged that he "didn't like" when Carol drank or went out with other men, and that they argued when she did so. He also acknowledged that he did not speak to police until April 2014 and told them then that he was only in the Ashland apartment four or five times. Defendant did not recall whether he had any nosebleeds in May 1994. He explained that when he got a nosebleed, he would stop the bleeding with "tissue or old clothes" that would not need to be washed.

¶ 40    The parties stipulated that defendant was employed at Michael Jordan's Restaurant in May 1994, but that no records existed to show whether defendant worked on the night of the murder because the restaurant closed in 1999.

¶ 41    Following closing arguments and deliberations, the jury found defendant guilty of first-degree murder. Defendant filed a motion for a judgement notwithstanding the verdict, or alternatively, a new trial, which was denied. After a sentencing hearing, the trial court sentenced him to 60 years in prison. He now appeals.

¶ 42                                    II. ANALYSIS

¶ 43                              A. Evidentiary Rulings

¶ 44    On appeal, defendant argues that the trial court erroneously excluded evidence of Bonnie's statements to her friends. Specifically, defendant contends that he should have been able to introduce evidence that Bonnie told her friends that John was physically abusive and threatening during their marriage, and that, shortly before Bonnie's death, the couple argued about purchasing the VCR found atop her body in the bathtub.

¶ 45    Generally, a trial court has the inherent authority to admit or exclude evidence, and its decisions will not be reversed on appeal absent an abuse of that discretion. *People v. Johnson*, 2018 IL App (1st) 140725, ¶ 58. "A court abuses its discretion only when its decision is arbitrary, fanciful, or unreasonable or when no reasonable person would take its view." *People v. Comier*, 2020 IL App (1st) 170500, ¶ 51.

¶ 46    In this case, we agree with defendant that Bonnie's statements should have been admitted. The trial court excluded the statements as hearsay, which is defined as "an out-of-court statement offered to prove the truth of the matter asserted." *People v. Olinger*, 176 Ill. 2d 326, 357 (1997). Hearsay "is generally inadmissible due to its lack of reliability unless it falls within an exception to the hearsay rule." *Id.* One such hearsay exception is the state-of-mind exception, which allows a party to introduce statements indicating the declarant's state of mind where (1) the declarant is unavailable to testify at trial, (2) the declarant's state of mind is relevant to a material issue in the case, and (3) there is a "reasonable probability" that the proffered statements are truthful. *People v. Floyd*, 103 Ill. 2d 541, 546 (1984).

¶ 47    As Bonnie was obviously unavailable to testify at trial, the inquiry becomes whether her state of mind was relevant to a material issue and whether there was a reasonable probability that

her statements were true. In answering both of these questions in the affirmative, we are guided by this court's decision in the analogous case of *People v. Lang*, 106 Ill. App. 3d 808 (1982). There, the defendant, who was charged with murdering his wife, testified that he was happily married to the victim but got into an argument with her on the night of her untimely death. *Id.* at 812. According to the defendant, the victim was accidentally shot during a struggle for control of a shotgun that he had grabbed in order to shoot some of her belongings during the argument. *Id.* At trial, the State elicited testimony from three of the victim's friends and co-workers that in the weeks before her death, the victim told them that she was unhappy in marriage and planning on leaving the defendant. *Id.* at 814.

¶ 48    On appeal, this court held that the victim's statements were properly admitted under the state of mind exception to the hearsay rule, explaining the statements were "relevant to rebut the defense testimony concerning the marital accord between the defendant and the [victim], to respond to the defendant's version of how his wife was shot, and to suggest a possible motive for the defendant's crime." *Id.* at 815. The *Lang* court also found a "reasonable probability" that the victim's statements were true, as she "individually relayed that information to three different people on different occasions." *Id.* at 814.

¶ 49    Although the State attempts to distinguish *Lang* on the basis that the victim's statement there were admitted against the defendant, rather than a third party, we find this to be a distinction without a difference. Just as the State may introduce evidence of a defendant's guilt, a defendant may introduce evidence of a third party's guilt as a defense. See *Holmes v. South Carolina*, 547 U.S. 319, 331 (2006) (an accused's right to present a complete defense through evidence of a third party's guilt cannot be arbitrarily restricted). The logic of why the *Lang* victim's statements were relevant to prove the defendant's guilt applies with equal force to Bonnie's statements as evidence

of John's guilt and, therefore, defendant's innocence. Like the defense's theory in *Lang*, the State's theory here was that John had no motive to kill Bonnie because their relationship was harmonious and never violent. Under such circumstances, Bonnie's statements were relevant to rebut John's testimony of an amicable divorce, especially where there was evidence that John and Bonnie had recently argued about one of the very items staged atop Bonnie's body in the bathtub. *Lang*, 106 Ill. App. 3d at 815; see also *People v. Weber*, 264 Ill. App. 3d 310, 317 (1994) (testimony that the victim told her friends she intended to tell the defendant she wanted to date other people was relevant to rebut the defendant's testimony that their relationship was going smoothly). Moreover, Bonnie's statements, like those in *Lang*, bear reasonable indicia of reliability, as they were made to multiple close friends on different occasions. Accordingly, we conclude that the trial court erred in excluding Bonnie's statements under the hearsay rule.

¶ 50    Having determined that the trial court erroneously excluded Bonnie's statements, we must now address to which remedy, if any, defendant is entitled. The exclusion of admissible evidence is subject to harmless error review, meaning that "[t]his court will not reverse a conviction based upon the exclusion of admissible evidence unless the evidence could have reasonably affected the verdict." *People v. Damnitz*, 269 Ill. App. 3d 51, 60-61 (1994). The test is whether the reviewing court can determine a beyond a reasonable doubt that the error did not contribute to the jury's verdict. *In re Brandon P.*, 2014 IL 116653, ¶ 50.

¶ 51    Here, we cannot say the error was harmless beyond a reasonable doubt, as the State's evidence against defendant was relatively weak and circumstantial. The State's case rested almost entirely on defendant's blood being found on a towel at the crime scene. However, there was no direct evidence that defendant's blood was left on the towel around the time of the murder and no evidence of a motive for the killing. Defendant also offered several alternative explanations as to

why his blood was in the apartment and testified that he was at work on the night of the murder. Although the jury apparently rejected his explanations and alibi, we believe that the jury could have viewed them differently had it been presented with the erroneously excluded evidence. Bonnie's statements could have also undermined the credibility of John, who denied abusing Bonnie and testified that their divorce was no longer contentious.

¶ 52    With that said, we remand for a new trial rather than vacate defendant's conviction outright. When deciding whether to remand a matter, this court is "required" to consider whether a new trial would violate the double jeopardy clause of the United States Constitution. *People v. Lopez*, 229 Ill. 2d 322, 366-67 (2008). The double jeopardy clause prohibits retrial where it would allow the State a second opportunity to supply sufficient evidence where it did not do so in the first trial. *People v. Harris*, 2015 IL App (1st) 132162, ¶ 45. However, double jeopardy does not prohibit a retrial where the evidence presented at the first trial was sufficient to sustain a conviction. *Id.*

¶ 53    Although the State's evidence was less than overwhelming, we find that it was sufficient such that a retrial is permitted. In assessing the sufficiency of the evidence, we must view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found all the elements of the offense beyond a reasonable doubt. *People v. Hernandez*, 2017 IL App (1st) 150575, ¶ 136. In this case, defendant's blood was found co-mingled on a towel with Bonnie's blood. DNA testing did not reveal any other person's blood in the apartment. The towel containing defendant's blood was recovered from the top of the kitchen trash can, and there is no dispute that the killer used that towel to clean up the crime scene. This is in contrast to other towels found at the scene, which contained only Bonnie's blood and were used to stage her body in the bathtub. As the evidence showed that Peyatt, the downstairs neighbor, interrupted the killer while they were still in Bonnie's apartment, a reasonable inference was that

the killer originally intended to dispose of the towel before leaving. Additionally, the evidence established that (1) Bonnie's apartment showed no signs of a robbery or forced entry, (2) defendant was likely aware that Bonnie often kept the backdoor unlocked, and (3) both defendant and his wife changed their account of when he was last in the apartment once they learned that his DNA had been discovered at the scene. Considering this evidence in the light most favorable to the State, we conclude the evidence was sufficient to sustain a conviction and therefore remand for a new trial.

¶ 54                                III. CONCLUSION

¶ 55    Because the trial court erroneously prevented defendant from presenting important evidence at trial, we remand for a new trial consistent with this order.

¶ 56    Reversed and remanded.