**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 200475-U

Order filed November 7, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-20-0475 Circuit No. 13-CF-505 |
| KAREEM GREEN, | ) ) ) | Honorable David M. Carlson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE DAVENPORT[1] delivered the judgment of the court.
Justice Hettel concurred in the judgment.
Justice McDade dissented.

_____

**ORDER**

¶ 1     *Held*:  The State proved defendant guilty beyond a reasonable doubt. The court did not abuse its discretion by refusing to allow defendant to present certain evidence.

¶ 2     Defendant, Kareem Green, appeals his convictions. Defendant argues that he was not proven guilty beyond a reasonable doubt because he had an alibi in regard to one victim and the

_____

[1]This case was reassigned to Justice Davenport on October 17, 2023, after Justice O'Brien was elected to the Illinois Supreme Court.

second victim admitted she was 20 to 35% sure another individual committed the crime. Defendant further argues that the Will County circuit court abused its discretion by refusing to allow him to present evidence regarding an alternative suspect, including a sketch by one victim, a mugshot, and the circumstances surrounding an incident that involved this alternative suspect. We affirm.

¶ 3                                                I. BACKGROUND

¶ 4        The State charged defendant with burglary (720 ILCS 5/19-1(a) (West 2012)), aggravated battery (*id.* § 12-3.05(c)) of A.O., attempted kidnapping (*id.* §§ 8-4(a), 10-1(a)(2)) of A.O., two counts of unlawful restraint (*id.* § 10-3(a))—one count each as to A.O. and Y.M., and battery (*id.* § 12-3(a)(2)) of Y.M. Defendant was found guilty of aggravated battery, attempted kidnapping, two counts of unlawful restraint, and battery. He appealed and this court vacated defendant's convictions, reversed the denial of defendant's motion to suppress, and remanded for further proceedings. *People v. Green*, 2016 IL App (3d) 150720-U, ¶ 29.

¶ 5        On remand, the matter proceeded to a jury trial. A.O. testified that on January 29, 2013, she was 17 years old and attended Bolingbrook High School. School ended at 3:05 p.m. and she left immediately. She did not have to stop at her locker or do anything prior to leaving. She would typically walk home from school and it took her approximately 25 to 30 minutes. On January 29, she exited the school, crossed the street, and entered the park. The park goes "[s]traight to the subdivision, crossing the bridge." There is a path leading into the subdivision. She noticed a Ford Explorer at the end of the path. A.O. thought it might be her brother. A.O. slowed down but when she realized it was not her brother she continued walking. A.O. saw the Ford Explorer pass her and she continued walking. Then "[t]he truck came back again, but this time he looked over at me and he slowed down. He was passing by me real slow." A.O. found it unusual but continued walking. At that point, she was turning onto Far Hills Drive. The Ford Explorer parked at the end

2

of Far Hills Drive by an alley. A.O. saw a man, whom she later identified in court as defendant, "wearing a T-shirt, sweats, not that tall of a guy, a little tall" exit the vehicle. Defendant jogged toward A.O. but continued past her. Defendant then passed A.O. again. After passing A.O. the second time, defendant turned around and walked toward her. He asked her something and after she responded, "he started to grab [her] and he kept saying come here, come here." A.O. stated that he "was feeling on" her and when she pushed him away he grabbed her by the waist and tried carrying her to his vehicle. Defendant was able to move A.O. several feet and then she "looked at him and *** saw in his eyes that he saw something and he got scared, that's when he let [her] go and he started running."

¶ 6        A.O. saw a truck driving down the street, and the driver, later identified as Kevin Martin, stopped to check on her. Martin wrote down his name and number for A.O. and then chased defendant. A.O. did not see where defendant went. After Martin left, A.O. called her mother and continued walking home. Her boyfriend picked her up after she went through the alley and onto Schmidt Road. Her boyfriend took her home where A.O.'s father was already in contact with the police.

¶ 7        Maps of the area were admitted into evidence, and A.O. explained the path she took home, including identifying the school, the park, the subdivision, and the alley. She further pointed out the location of the attack. On one map, she identified where her school and home were, and the location of the attack.

¶ 8        A.O. stated that on March 5, 2013, she went to the police department to view a photographic lineup. She was shown a document, later identified as lineup instructions, which she stated she read and signed prior to the lineup being administered. A.O. also stated that a detective read it to her prior to the lineup. A.O. identified the lineup that was shown to her. A.O. noted that

3

she circled defendant on the lineup and did so "[b]ecause that's the guy that attacked [her]." No one suggested to her who she should pick out of the lineup.

¶ 9    On cross-examination, A.O. indicated that her boyfriend was supposed to pick her up from school that day but sent her a text message that he was running late. She initially stated that her boyfriend sent the message after she left school but then stated she did not remember if it was before or after. She stated that she did not wait for her boyfriend and continued walking but then agreed that she "paused" and waited for him but continued walking when she knew he was going to be late. A.O. stated that it did not take 15 minutes to walk to Schmidt Road. She was impeached with testimony from a prior proceeding where she agreed it took "around 15 minutes" to walk to Schmidt Road. A.O. stated that the person who attacked her had an accent. A.O. went to the police department on January 30 to participate in making a sketch of the suspect. A.O. provided input for the sketch and offered suggestions that led to changes in the sketch. She rated the accuracy of the sketch as an 8 out of 10. The sketch of the suspect had a goatee, not a full beard. A.O. agreed that she knew there was a suspect in custody when she did the lineup. She further agreed that she knew she was being shown photographs that included a suspect. As to the person she picked out of the lineup, A.O. reiterated that she "knew it was him."

¶ 10    On redirect, A.O. stated that she advised police that "the offender was a black male, approximately five, eight with a muscular build, 21 to 25 years old" and that he "had a small afro and trimmed beard and spoke with some kind of accent." On recross, A.O. agreed that a trimmed beard is a goatee.

¶ 11    Martin testified that he lived on Princeton Drive, and Bolingbrook High School was approximately two blocks from his residence. On January 29, 2013, he left his house at approximately 3 p.m. to pick his daughter up from school. Her school dismissed between 3:10 and

4

3:15 p.m. He took Princeton Drive to the end of the cul-de-sac and then drove onto Far Hills Drive. On that day, he noticed A.O. walking and a young man, who he later identified in court as defendant, "on the opposite side of the street like running directly at her." Martin did not know A.O. or defendant. Martin described defendant at the time he saw him running as having "a small beard, afro, fitted shirt, sweat pants" and he was black. Defendant's beard looked like it had been freshly cut and was neat. Defendant was looking directly at A.O. and running in her direction but when he saw Martin, "he veered and continued to like jog past her, and I thought that was weird because to me he was looking right at her and all of a sudden he was jogging past her." Martin continued driving but maintained visual contact of A.O. and defendant. Nothing obstructed his view. When Martin made his way up the block, defendant "pivoted, made a U-turn, and then turned right back in her direction, and went right at her." Martin saw defendant trying to grab A.O. and pull her toward him. Defendant grabbed A.O. about the waist. Martin made a U-turn and "punched it up the street." When defendant saw Martin coming back, he released A.O. and ran towards a "greenish type of dark color" Explorer. Martin was shown a photograph and he agreed that it depicted a vehicle similar to the one he saw on January 29. He admitted he previously described the vehicle as "dark money-green" and that it could have been a Mercury Mountaineer. The vehicle did not have a stripe "that he kn[e]w of. It was plain, one color."

¶ 12          Martin talked with A.O. and attempted to follow the Explorer but was unable to keep up with it. He did not see where it went because he was focused on A.O. Martin provided A.O. his information and spent a minute or two with A.O. When Martin arrived at his daughter's school, she was already out of school and in the principal's office, which is the procedure when a parent is late picking up their child.

¶ 13          On March 5, Martin was called to the police department because "they caught a guy and they wanted to see if it was the guy that *** [he] described." Prior to viewing the photographic lineup, a detective read Martin instructions and he reviewed the instructions. When Martin was shown the lineup, he was unaware that one photograph was the person that the police suspected. He stated that the police "didn't like guide me into any direction, and *** you couldn't do that to me anyway because *** I'm not in there to falsely pick anybody like that." Martin circled the photograph of defendant "[b]ecause that's the image that I had in my head of the guy." The detective did not tell him which photograph to circle.

¶ 14          Y.M. testified that on January 31, 2013, she was 16 years old and attended Bolingbrook High School. After leaving school that day at 2 p.m., she walked to a friend's apartment. Y.M. walked through the park and onto a road to get to the apartment. While on the road, she heard footsteps behind her. Y.M. turned around and noticed a person, whom she later identified in court as defendant, in a red jacket walking behind her. Defendant had a hood on. When she arrived at the apartment, she opened the door and held it for defendant. As Y.M. entered the building, she was in front of defendant. She climbed the stairs to the second floor, as did defendant. She and defendant began walking down the hallway, which had ceiling lights. Halfway down the hallway she heard defendant's footsteps speed up. Y.M. turned around and saw defendant's hand go across her face. "His right hand was on [her] left cheek and his left hand was on [her] buttocks." Y.M. struck defendant with her elbow and "[h]e stumbled initially and then he got his balance and ran out." Y.M. screamed for help. Y.M. stated the struggle lasted a few seconds and as defendant left she "was able to get one glance at his face." Nothing obstructed her view of defendant's face. Defendant's hood came off during the struggle.

¶ 15       Y.M. provided a description to the police that defendant was black, between five feet, three inches and five feet, five inches tall, with minimal facial hair and an "Afro-type of hairdo" and wearing a red jacket. She was shown a red North Face jacket, which an officer later testified was recovered from defendant, and she stated it looked like the jacket defendant was wearing when he grabbed her. On March 5, 2013, Y.M. went to the police station to view a photographic lineup. Prior to viewing the lineup, a detective went over the instructions with her and she read the instruction sheet. The detective told Y.M. that the offender may not be in the photographs. Y.M. circled defendant's photograph and identified him as her attacker. The detective did not tell Y.M. which photograph to choose and no one influenced her decision. Y.M. "remember[ed] saying that [she] could tell it was him immediately due to his eyes."

¶ 16       On cross-examination, Y.M. testified that when she first noticed someone behind her while she was walking she did not pay much attention. Y.M. stated that after she elbowed defendant, "[o]nce he regained his balance and he looked back at me, that was the one glance I got directly of his face before he ran out." Y.M. looked at defendant's face for "about a second." She got a look at defendant's face but not a "pretty good look." Y.M. told the officers that defendant wore a red North Face jacket. She also said that defendant had a hood on but she did not know if the hood was attached to the jacket. Y.M. described defendant to the officers as having a "chubby face" and a medium to heavy build with minimal facial hair. She described him as having a mustache but not a beard.

¶ 17       On February 6, 2013, Y.M. was approached by a classmate who asked if her attacker could be someone the classmate knew from Facebook. The classmate showed Y.M. a Facebook profile of Tyrone Hughes. There were similarities between Hughes and defendant. When asked if there were enough similarities that she brought Hughes to the attention of the police, she stated "Not

7

necessarily. I brought it to their attention because it was a possibility, and I just wanted to make them aware of any other details that might arise due to the attack." Y.M. admitted that when she brought Hughes to the detective's attention, she stated that Hughes looked like her attacker. On the same day Y.M. gave the detectives Hughes's name, she also gave them a sketch which depicted her attacker with a mustache and not a beard. Y.M. did not recall writing the name Hughes on the sketch. When Y.M. participated in the photographic lineup she told the officer that the skin tone was off and he told her that skin tone can look different because of the lighting. Y.M. made her identification after the officer told her that. She told the officers that she made the identification based upon the face shape, lips, and eyes of the person in the lineup. Y.M. was asked if she stated that Hughes and her attacker had a similar face and mouth shape and she replied that she said they had similarities. She was impeached with prior testimony that Hughes's face, mouth, and eyes were similar to her attacker.

¶ 18    On redirect, Y.M. stated that the instructions given prior to the photographic lineup stated that the photographs could be darker or lighter in tone and that skin tone could change based upon the lighting. Y.M. never told the police that Hughes was her attacker. She never said that anyone else was her attacker.

¶ 19    On recross, Y.M. was asked "How similar would you say *** Hughes looked to the person that attacked you" on a scale of 1 to 100. She responded, "I would say there is like maybe a 20 percent chance. There are similarities." Y.M. was impeached with prior testimony where she said, "35 percent."

¶ 20    The officer who conducted the photographic lineup with Y.M. testified that he "didn't feel there was any unsureness" in her identification of defendant. He noted that after Y.M. pointed at

8

defendant's photograph, she was unsure of the skin tone, and after he explained that skin tone can appear different in photographs, Y.M. circled defendant's photograph.

¶ 21    Sergeant Sean Koren, the officer who conducted the photographic lineup with A.O., testified that after A.O. selected defendant's photograph, he asked her what stood out to her and she stated it was his eyes, eyebrows, and nose. Koren also conducted the photographic lineup with Martin and stated that when he asked Martin, after Martin selected defendant's photograph, what stood out to him, Martin stated it was his eyes, hair, and beard.

¶ 22    Kenneth Simpson testified that in 2013 he was a detective. He was assigned to take photographs of a vehicle that was possibly involved in an incident. Simpson stated the vehicle was defendant's and he described it as a "green, blueish Ford SUV." A photograph of the vehicle was admitted into evidence. Simpson testified that the hospital was "not far" from where A.O. was attacked. He explained it was approximately 1½ to 2 miles away. It would take as little as two minutes to get there and "[e]ven if you hit every light, [he] c[ould]n't see it being any more than five minutes."

¶ 23    A video recording of a traffic stop of defendant on February 1, 2013, was admitted into evidence. Defendant's vehicle is visible on the video. Defendant was out of the vehicle for a few moments, and his face, including his facial hair, was visible. Additionally, the photographic lineups shown to A.O., Y.M., and Martin were admitted into evidence, along with the lineup instructions.

¶ 24    After the State rested, defendant moved for a directed verdict, which the court denied. Defendant was allowed to elicit testimony from Detective Nicholas Azzo regarding other individuals he investigated in relation to this matter. Defense counsel asked various questions regarding those investigations. Those individuals were ruled out as suspects. Azzo did not recall

9

interviewing Hughes. None of these individuals appeared in the photographic lineups. On February 1, 2013, Azzo received a call to view a possible suspect. A vehicle matching the description from A.O.'s attack was stopped. Defendant was the driver. Azzo had a conversation with defendant, and defendant asked, "is this about the guy who was kidnapping the girls by the school?"

¶ 25    Gerald Staley testified that in January 2013 he was the human resource director at the hospital. Defendant worked at the hospital at that time. Everything connected to the hospital network, including the computer system and the surveillance system, are "time stamped at the same time." Surveillance video from the hospital was admitted into evidence and played for the jury. Staley testified that the video shows the emergency room entrance that is located at "the corner of Schmidt and Remington." Staley identified defendant on the surveillance video walking into the hospital wearing scrubs. The video shows the date as January 29, 2013, and when the man Staley identified as defendant walks into the hospital the time stamp is approximately 3:17:40 p.m. Defendant's timecard, which was admitted into evidence, shows that he clocked into work at 3:20 p.m.

¶ 26    The sketches that A.O. and Y.M. completed with the police sketch artist were admitted into evidence. Simpson testified that the sketch completed with A.O. showed the attacker with a goatee and the sketch completed with Y.M. showed the attacker with a mustache and no beard. On February 6, 2013, Y.M. brought Simpson Hughes's name. Y.M. also brought Simpson a drawing that she had made. Simpson was shown the drawing by Y.M. and he identified his signature on the drawing. The drawing included writing—Y.M.'s name—and Simpson stated he did not write that and did not know who did. Additional writing—the name Hughes—was contained on the drawing and Simpson did not write that either.

10

¶ 27    Defense counsel asked Simpson if he investigated any incidents that Hughes may have had at Bolingbrook High School, and Simpson stated he did not. At that point, the State objected. Outside the presence of the jury, defense counsel stated he was trying to establish Hughes as an alternative suspect. The State noted that there was an investigation into Hughes where he brought a gun to the high school and Hughes was charged in February 2013 but that it was irrelevant to defendant's trial and prejudicial. The court inquired as to the relevance and defense counsel stated "[t]he relevance is he is a bad guy." Defense counsel asserted there was no question that this evidence was relevant, which the court did not agree with. Defense counsel argued that the violent nature of an alternative suspect is relevant and the State replied that there is no similarity between Hughes's offense and the offenses defendant was on trial for. Defense counsel advised the court that Hughes was expelled from Bolingbrook High School but returned to the school and brought a gun with him. When he was confronted about not being allowed at the school, he spit on a school employee. He was charged with aggravated battery and a weapons offense after his home was searched and a weapon was recovered. The court noted that defense counsel was attempting to introduce a collateral issue. Defense counsel argued that the offenses were similar in that both Hughes's conduct and the offenses against Y.M. and A.O. were brazen. The court refused to allow the evidence of Hughes's incident at the high school stating that not only could it prejudice the State, it could inflame the passions of the jurors against defendant because they may infer he had a weapon.

¶ 28    Defense counsel then noted that he wanted to introduce Hughes's mugshot into evidence arguing it was "a meld of the two descriptions" given by A.O. and Y.M. The State argued it was not relevant. The court agreed stating that whether the jury believed the sketches completed with

11

A.O. and Y.M. were accurate depictions of Hughes was "collateral at best." Generally, the court noted that it was not going to let this turn into a trial as to Hughes.

¶ 29　　　Defense counsel also stated that he wanted to introduce the sketch that Y.M. prepared. The sketch was not shown to Y.M. during her testimony. Defense counsel argued that Y.M. stated the sketch was of Hughes but the State argued that that was not Y.M.'s testimony and she only stated the sketch was of her attacker. Further, she did not remember writing Hughes on the sketch and Simpson did not write it. The court agreed but asked if that went to the weight of the evidence. The State argued that Y.M. did not remember putting Hughes's name on the sketch and Simpson did not write Hughes's name but that defendant now wanted to enter it into evidence and say it was Hughes because his name is on it. The court replied "I don't know if you're going to say that. It's just a sketch that she prepared." Further, that it did not "know what the reasonable inference" was. Defense counsel argued that they needed to look at the context. The court then stated that if it allowed the sketch into evidence, defense counsel could not argue in closing argument that Y.M. said the sketch was Hughes because that was not a reasonable inference from the evidence. Defense counsel disagreed and the court stated it was not going to allow the sketch. The court stated the sketch did not meet the foundational requirements.

¶ 30　　　Simpson testified that if there was no *Miranda* form for Hughes then he did not interview Hughes. Simpson did not believe that he interviewed Hughes. Simpson did not include Hughes in a photographic lineup. Simpson came into contact with numerous individuals during his investigation and he eliminated individuals as suspects by the vehicle they drove or identifying descriptors. Hughes's name came to his attention because Y.M. told him that Hughes looked like her attacker. Y.M. never told Simpson that Hughes was the attacker. Y.M. was not shown a photographic lineup that included Hughes.

12

¶ 31        Detective Jason Mitchem testified that he "was dispatched at approximately 3:30" in regard to A.O.'s attack. According to his report, the incident occurred at 3:24 p.m. That information was generated by a dispatcher. The report indicated that dispatch received the call at 3:21 p.m. It further indicated that there was a 10 to 15 minute delay in reporting. A.O. indicated to Mitchem that the attacker had a small "afro," a trimmed beard and an accent. Mitchem stated that he lived in the area where the incident occurred and that "[i]t takes approximately a minute to a minute and a half to walk over the bridge, though the park, over the bridge into the neighborhood." He continued that "to leave Bolingbrook High School and get across the bridge would only take a minute to a minute and a half."

¶ 32        Outside the presence of the jury, there was argument regarding the admissibility of phone records that defendant wanted to argue. After agreeing the records could be admitted, while the parties were determining what exhibit number they were at, the court brought up its ruling on the admissibility of Y.M.'s sketch. It stated that the drawing contained hearsay—Hughes's name— and it had considered allowing the sketch in with the caveat that the hearsay would not be used to argue anything. Defense counsel stated that when he said he disagreed earlier, it was that he disagreed that it was hearsay, not that he would not follow the court's order. The court replied that Hughes's name was "pure hearsay with no foundational guarantee of authenticity *** because nobody is able to answer who put that name on there. So that's why I am not allowing it in." Counsel responded, "I was willing to also put everything in except the name, but that's fine. I just wanted to make the record clear."

¶ 33        When the trial resumed, defendant entered phone records into evidence showing that on January 31, 2013, he received a call at 2:10:25 p.m. with a duration of 24 seconds.

¶ 34    The jury found defendant guilty of both counts of unlawful restraint—one count each as to A.O. and Y.M., battery of Y.M., and aggravated battery of A.O. Defendant filed a motion for new trial arguing that the State did not prove him guilty beyond a reasonable doubt and that the court erred by not allowing defendant to introduce evidence of Hughes's incident at Bolingbrook High School, Hughes's mugshot, and Y.M.'s sketch. The court denied the motion. It sentenced defendant to four years' imprisonment for aggravated battery and a concurrent term of two years' imprisonment for unlawful restraint. The other counts merged. Defendant appeals.

¶ 35                                II. ANALYSIS

¶ 36                          A. Sufficiency of the Evidence

¶ 37    Defendant argues that the State failed to prove him guilty beyond a reasonable doubt. Defendant does not argue that the elements of the offenses were not proven but instead, as to both victims, he argues that the identifications of him as the perpetrator were not sufficient to sustain the convictions. Additionally, he argues that the timeline of A.O.'s attack made it impossible or improbable for him to have been the perpetrator.

¶ 38    When defendant challenges the sufficiency of the evidence "it is not the function of this court to retry the defendant." *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Instead, we must determine whether the evidence, viewed in the light most favorable to the State, would permit any rational trier of fact to find the elements of the offense proven beyond a reasonable doubt. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). "This standard of review does not allow the reviewing court to substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses." *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). "[I]t is the function of the trier of fact to determine the credibility of the witnesses, the weight to be given to their testimony and the inferences to be drawn from the evidence." *People v. Akis*, 63

14

Ill. 2d 296, 298 (1976). A criminal conviction "will not be set aside unless the proof is so unsatisfactory, improbable or implausible as to justify a reasonable doubt as to the defendant's guilt." *People v. Slim*, 127 Ill. 2d 302, 307 (1989). "When the facts in a case give rise to more than one inference, a reviewing court shall not substitute its judgment for that of the trier of fact unless the inference accepted by the trier of fact is inherently impossible or unreasonable." *People v. Price*, 225 Ill. App. 3d 1032, 1035 (1992). We must allow all reasonable inferences from the evidence in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42.

¶ 39        "A single witness' identification of the accused is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification." *Slim*, 127 Ill. 2d at 307. "This is true even in the presence of contradicting alibi testimony, provided that the witness had an adequate opportunity to view the accused and that the in-court identification is positive and credible." *Id.* The

> "circumstances to be considered in evaluating an identification include: (1) the opportunity the victim had to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the victim at the identification confrontation; and (5) the length of time between the crime and the identification confrontation." *Id.* at 307-08.

¶ 40                                        1. A.O.

¶ 41        With regard to A.O., defendant's main argument is that it was impossible or highly improbable for him to have been A.O.'s attacker. He argues that he would not have been able to attack A.O. at the time the evidence shows she was attacked and make it to the hospital for work when he did.

15

¶ 42 Viewing the evidence in the light most favorable to the State, we conclude that it was not impossible or improbable for defendant to have attacked A.O. Specifically, A.O. testified that she left school at 3:05 p.m. Mitchem, who was familiar with the area, testified that it would only take a minute to a minute and a half to walk from the high school to the neighborhood where the attack occurred. The jurors were shown maps of the area and the route that A.O. took so they could gauge for themselves how long they believed it would have taken A.O. to reach the location where she was attacked. Additionally, A.O.'s and Martin's testimony both indicated the attack was brief. The 911 call came at 3:21 p.m. and there was a record indicating that there was a 10 to 15 minute delay in the attack being reported. Further, Simpson testified that it could take as little as two minutes to get from the attack location to the hospital where defendant worked, and at most, five minutes. Defendant was shown walking into the hospital at approximately 3:17:40 p.m. Based on this evidence, it is not impossible or improbable for the attack to have occurred at approximately 3:10 p.m. and for defendant to have made it to the hospital, changed from sweatpants to scrubs and walked into work at 3:17:40 p.m. Therefore, the proof is not so unsatisfactory, improbable or implausible to justify overturning defendant's conviction. See *id.* at 307.

¶ 43 As a secondary argument, defendant argues that A.O.'s and Martin's identifications were insufficient. But even a single identification can be sufficient, and in this matter there are two positive identifications of defendant. Both witnesses had a sufficient opportunity to view defendant at the time of the crime. A.O. saw defendant multiple times and Martin was specifically paying attention to defendant because of the perceived odd behavior of running toward A.O. and then past her. Both witnesses made positive identifications and only a month passed between the attack and the identifications. Although there are some discrepancies regarding their initial description of defendant, mainly in relation to his facial hair, our supreme court has stated that "discrepancies

16

and omissions as to facial and other physical characteristics are not fatal, but simply affect the weight to be given the identification testimony." *Id.* at 308. Further, "[t]he presence of discrepancies or omissions in a witness' description of the accused do not in and of themselves generate a reasonable doubt as long as a positive identification has been made." *Id.* at 309. Here, although defendant argues his beard was "bushy," the jury was able to observe defendant's facial hair in the February 1 recording of the stop of defendant and then weigh any discrepancies. Additionally, both A.O. and Martin made positive photographic lineup identifications and identified defendant at trial. Therefore, the discrepancies in their description of defendant do not generate reasonable doubt. Also, in addition to the identifications of defendant, A.O. and Martin both stated that the attacker was in a Ford Explorer and Martin described it as green. Defendant was stopped within days of the attack driving a Ford Explorer which an officer described as a "green, blueish" vehicle. A photograph of defendant's vehicle, as well as a video recording of the vehicle, were introduced into evidence. Although defendant latches on to discrepancies between Martin's description of the vehicle and what he says his vehicle actually looked like, the jurors were able to view the photograph and video of defendant's vehicle and weigh any discrepancies for themselves. Based on the foregoing, we cannot say that the State failed to prove defendant guilty beyond a reasonable doubt in regard to A.O.'s attack.

¶ 44                                         2. Y.M.

¶ 45         Defendant argues that there was reasonable doubt regarding whether he was Y.M.'s attacker because she herself stated that there was a 20% chance Hughes was the attacker and her identification of defendant was unreliable.

¶ 46         As to defendant's first argument, Y.M. did not state that there was a 20% chance that Hughes was her attacker. Rather, she answered defense counsel's question of how similar Hughes

17

was to her attacker on a scale of 1 to 100 with a "20 percent chance." Because the question as posed and the response do not perfectly align, the meaning of the response was open to interpretation, which would be a function for the jury. See *Price*, 225 Ill. App. 3d at 1035. Viewing this evidence in the light most favorable to the State and allowing for the reasonable inference in favor of the State, then this evidence is viewed as Y.M. stating that Hughes and her attacker were 20% similar. As such, this testimony by Y.M. does not equate to reasonable doubt.

¶ 47     Turning to Y.M.'s identification of defendant as her attacker and the factors set forth in *Slim* for evaluating an identification, we note that Y.M. made it clear that she had an opportunity to view defendant's face, albeit for a short period of time. There is no indication that Y.M. was not paying close attention to defendant when she looked at his face after elbowing him. Defendant attempts to use Y.M.'s statement that she initially did not pay attention to the person behind her to say that she was not paying adequate attention to defendant to be able to make a reliable identification; however, the statement was not in relation to when Y.M. viewed defendant's face, but earlier, when she first noticed defendant walking behind her. Defendant points to a discrepancy with Y.M.'s prior description of defendant—that he only had a mustache, not a beard—to say that her prior description was not accurate. However, again, these types of discrepancies are not fatal. See *Slim*, 127 Ill. 2d at 308-09. Y.M. was confident in her identification of defendant which she made during a photographic lineup approximately one month after the attack and again in court during trial. Thus, weighing the *Slim* factors, we conclude that Y.M.'s identification of defendant was positive and credible. Additionally, we note that Y.M. described her attacker as wearing a red North Face jacket and defendant owned a red North Face jacket. Further, the jury was allowed to hear the evidence regarding A.O.'s attack, which was similar in time, place, and nature. Taking all

18

of this evidence together and viewing it in the light most favorable to the State, we conclude that it is sufficient to permit a rational trier of fact to find defendant guilty beyond a reasonable doubt.

¶ 48                                    B. Alternative Suspect Evidence

¶ 49        Defendant argues that the court denied him a fair trial by refusing to allow him to present evidence of an alternative suspect. Specifically, he argues the court should have allowed evidence regarding Hughes bringing a gun to Bolingbrook High School and spitting on an employee after being expelled, Hughes's mugshot, and a sketch by Y.M.

¶ 50        "Evidentiary rulings are within the sound discretion of the trial court and will not be disturbed on review unless the trial court has abused its discretion." *People v. Cruz*, 162 Ill. 2d 314, 331 (1994). "An accused may attempt to prove that someone else committed the crime with which he is charged." *People v. Thomas*, 145 Ill. App. 3d 1, 12 (1986). "Whether what is offered as evidence will be admitted or excluded depends upon whether it tends to make the question of guilt more or less probable, and a trial court may reject offered evidence on the grounds of irrelevancy if it has little probative value due to its remoteness [or] uncertainty." *Id.* at 13. Citing various cases where alternative suspect evidence was excluded, the *Thomas* court stated:

> "the appellate court decisions have generally found that remote, nonspecific, and speculative evidence that the crime could have been committed by another is properly excluded. (*People v. Smith*, 122 Ill. App. 3d 609 (1984) (evidence that another suspect matching the description of the perpetrator who is found in the area of the crime and initially arrested excluded as remote connection with crime); *People v. Foley*, 109 Ill. App. 3d 1010 (1982) (evidence that testifying accomplice has a brother who fits description of perpetrator of crime excluded as not showing he was involved in the crime); *People v. King*, 61 Ill. App. 3d 49 (1978) (evidence

19

that another person had been investigated who physically resembled perpetrator and had a prior arrest for one of the crimes charged was excluded as too conjectural).)" *Id.*

Additionally, the *Thomas* court noted that "[i]f evidence can be introduced concerning a remote or nonspecific possibility that another may have committed the crime, trials could go on *ad infinitum* and juries could become hopelessly confused with speculative evidence." *Id.* Generally, evidence may be excluded if its probative value is outweighed by the danger of "confusion of the issues" or by considerations of "needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 51 Here, defendant wanted to introduce evidence relating to Hughes and a sketch by Y.M. The only connection Hughes had to this matter was that Y.M. brought his name to the attention of the police because he had similarities to her attacker. At no time did Y.M. indicate that Hughes was her attacker. There was no evidence that Hughes was in the vicinity of the attacks at the time they occurred. The idea that Hughes was the attacker was speculative and remote. See *e.g.*, *Thomas*, 145 Ill. App. 3d at 13-14 (finding the court did not abuse its discretion in refusing to admit evidence of an alternative suspect and noting that there was no direct evidence the purported alternative suspect committed the crime and that at most the proffered testimony "might cause speculation that [another individual] could have committed the crimes, but which did not directly implicate him").

¶ 52 Even so, the court allowed defendant to elicit testimony regarding Y.M. bringing Hughes's name to the attention of the police, and that Hughes looked similar to her attacker. The evidence the court excluded was even more remote, speculative, irrelevant, or cumulative. Specifically, Hughes's incident at the high school was too dissimilar to the crimes at issue in this matter to be

20

of much, if any, probative value and introducing that evidence could easily lead to confusion of the jury. See, *e.g.*, *People v. King*, 61 Ill. App. 3d 49, 54 (1978) ("If evidence could be introduced concerning a third party's [criminal conduct] without a more specific connection to the particular crime involved, trials could go on *ad infinitum* and juries would become hopelessly confused with the morass of evidence presented to them."). Although the court ultimately excluded the evidence based upon prejudice, which does not appear to be a proper basis (see *Cruz*, 162 Ill. 2d at 350 (noting that in a "case dealing with other-crimes evidence offered by a defendant, such evidence is admitted where the evidence contains 'significant probative value' to the defense without any reference to the element of prejudice") (quoting *People v. Tate*, 87 Ill. 2d 134, 143 (1981))), it did indicate that the evidence was not relevant and collateral which would be a proper basis to exclude it. Regardless, this court can affirm for any reason supported by the record. See *People v. Tondini*, 2019 IL App (3d) 170370, ¶ 25 (providing that this court "may affirm for any reason apparent on the record, regardless of the lower court's reasoning"). As to the mugshot of Hughes, it is again too remote and speculative that Hughes was the offender and his mugshot, in and of itself, does nothing to make it more or less probable that defendant committed the crimes. Further, it is somewhat cumulative in the sense that it was being offered to say that Hughes looked like the sketches provided by A.O. and Y.M., but Y.M. already testified that Hughes looked similar to defendant. As such, we find no abuse of discretion by the court in refusing this evidence.

¶ 53       Last, the sketch by Y.M. was excluded based on a lack of foundation. "A proper foundation is laid for the admission of documentary evidence when the document has been identified and authenticated." *People v. Ziemba*, 2018 IL App (2d) 170048, ¶ 51. Authentication "requires the proponent to present evidence that the document is what the proponent claims it to be." *Id.* Here, there was not a proper foundation to admit the document as a sketch of Hughes, which is what

21

defendant was attempting to do. Y.M. never stated that the sketch was Hughes and did not remember writing Hughes's name on the sketch. Although defendant asserts that he was willing to admit the sketch with Hughes's name redacted, he did not make this offer at the time the court ruled on the admissibility and again, wanted to argue the sketch was of Hughes. Regardless, as with the mugshot, the sketch itself would do nothing to make it more or less probable that defendant committed the crimes and would be cumulative of Y.M.'s testimony because she admitted making a sketch and giving it to the police and that the sketch only contained a mustache, not a beard. Therefore, we find no abuse of discretion by the court in excluding the sketch.

¶ 54                                    III. CONCLUSION

¶ 55        The judgment of the circuit court of Will County is affirmed.

¶ 56        Affirmed.

¶ 57        JUSTICE McDADE, dissenting:

¶ 58        I respectfully dissent from the majority's decision as I would find that the evidence was insufficient to prove defendant guilty beyond a reasonable doubt. This case concerns the prosecution of a single alleged perpetrator in two unrelated and largely dissimilar incidents. The identification of the perpetrator was the central issue in this case and the sole factor tying defendant to either crime. Eyewitness identification is the least reliable evidence, even under perfect conditions. See *People v. Starks*, 2014 IL App (1st) 121169, ¶ 71; *In re O.F.*, 2020 IL App (1st) 190662, ¶ 32; John P. Rutledge, They All Look Alike: The Inaccuracy of Cross-Racial Identifications, 28 Am. J. Crim. L. 207 (2001). Fallibilities in eyewitness identifications such as: (1) the weak correlation between a witness's confidence in the identification and its accuracy, (2) how the presence of a weapon can diminish the reliability of an identification, and (3) how

stress at the time of observation can render a witness less able to retain an accurate perception and memory of the event, are not understood by juries. *Starks*, 2014 IL App (1st) 121169, ¶ 72.

¶ 59 Here, there were considerable problems with the identifications made by the eyewitnesses in both incidents. While both victims identified the same individual, their identifications were suspect. In the incident reported by A.O., assuming defendant was the perpetrator, the relevant timeline was firmly fixed at each end. A.O. stated that school ended at 3:05 p.m. Defendant was *documented* entering the emergency room entrance of the hospital where he worked at 3:17, properly dressed for work, and clocking in for work at 3:20. This establishes a 12-minute window of opportunity for the offense to occur.

¶ 60 A.O. stated that she left school without delay and that, as it typically did, it took her about 15 minutes to reach the point on her walk home where the assault took place. That would place the assault at 3:20, the same time that defendant was, indisputably, clocking into his job and 3 minutes after he was photographed arriving at the hospital. *Based on A.O.'s testimony,* it was virtually impossible for defendant to have either (1) attacked A.O. at all at the indicated time or (2) attacked her, changed his clothes, and made it to work during the fixed span of time. See, *e.g.*, *People v. Rivera*, 2011 IL App (2d) 091060, ¶ 34 (the evidence, which did not completely exonerate the defendant, made the State's theory of the case "not likely" and would rely on an "absurd degree" of rationalization to explain the uncontested facts of the case).

¶ 61 The majority has accepted Detective Mitchem's estimate that it is possible to walk to the assault scene in 1 to 1-1/2 minutes. *Supra ¶* 31. That is not *per se* inconsistent with A.O.'s time estimate. Her 15-minute timeline represents her "usual" timing and must, therefore, include more than just walking at a clip to determine how quickly the distance can be covered. In addition, A.O. has admitted lingering in case her boyfriend came to pick her up. At any rate, her estimate of 15

23

minutes is very short, and it places defendant at the hospital when the attack allegedly occurred and when the 911 call was made. And it necessarily puts the interactions with Kevin Martin even further beyond the time defendant is firmly alibied. This later timing also gains credibility from the fact that Martin's arrival to get his daughter by 3:15 was sufficiently delayed that she had stopped waiting outside and gone to the principal's office to report that she had not yet been picked up.

¶ 62        Y.M.'s identification of her attacker in the incident she reported was even more suspect. She stated that she viewed her attacker for no more than one second. Nonetheless, she consistently stated that the perpetrator had a mustache but no beard or goatee. That description was echoed in the police artist's drawing and was further reinforced by her own sketch, which she had drawn and presented to one of the investigators, saying that it looked like her attacker. Like the police drawing, the sketch depicted a man with a mustache and no beard. Defendant clearly had a beard and no mustache at the time of the incident. She stated that she was 20 to 35% sure that her attacker was another person, Hughes. That name was written on the sketch, but Y.M. denied placing it there. Rather than simply redacting the name, the court refused to allow the jury to see it at all, even though defense counsel had no objection to the redacted sketch being published to the jurors. Equally troublesome, when shown photographs of possible perpetrators by the police, Y.M. stated that the skin color of the assailant was different from any of the suspects portrayed in photographs, but she was told that skin tone could look different because of the lighting. These discrepancies in the identification were further exacerbated when the court denied defendant his right to present evidence of Hughes as an alternative suspect. A defendant has the right to present evidence of a third-party's guilt, and the presentation of this evidence may not be arbitrarily restricted. *People v. Ramirez-Martinez*, 2021 IL App (1st) 171443-U, ¶ 49

¶ 63        Because of the significant identification issues as set out above, I would find, even applying the *Collins* standard, the State failed to prove defendant guilty beyond a reasonable doubt and reverse his convictions.